Filed 3/13/13  P. v. Mohamed CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EHAB MOHAMED,<br><br>    Defendant and Appellant. | B240176<br><br>(Los Angeles County<br>Super. Ct. No. LA069610) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Susan M. Speer, Judge.  Affirmed.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Linda C. Johnson and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Ehab Mohamed appeals his judgment of conviction of two counts of attempted grand theft of personal property (Pen. Code,[1] §§ 664, 487, subd. (a)). After entering into an agreement with a medical device manufacturer to lease certain surgical equipment, Mohamed attempted to sell the equipment to a prospective third party buyer. On appeal, Mohamed contends that the evidence was insufficient to support his convictions because he had a good faith belief that he owned the equipment at the time he attempted to sell it. Because there was substantial evidence supporting each conviction, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Prosecution Evidence

Mohamed was charged with the attempted grand theft of personal property belonging to Sound Surgical Technologies (count 1) and Nikki Rasmussen (count 2). Sound Surgical is a Colorado-based company that designs, manufactures, and sells medical devices, including a liposuction system called the Vaser. The Vaser system is comprised of three main components (the VentX Console, the Vaser Amplifier, and the Precision Fluid Management System), along with several smaller instruments. In 2007, the sale price of the Vaser system was between $65,000 and $85,000. A medical practitioner could purchase the entire system outright, or alternatively, purchase the smaller instruments and enter into a lease agreement with Sound Surgical for the three larger pieces of equipment.

Jodi Emert worked for Sound Surgical as a territory manager in the Los Angeles area. In July 2007, Emert met with Mohamed, a physician, at his Beverly Hills office to discuss Mohamed's interest in the Vaser system. At that time, Emert had been working for Sound Surgical for a few months and was unaware that the company both sold and leased the Vaser system. Rather, in Emert's experience, the main components of the

---

[1] All further statutory references are to the Penal Code.

2

system were only available for lease and the smaller disposable components were only available for sale.

At their initial meeting, Emert provided Mohamed with a three-page document entitled "License and Use Agreement." In addition to discussing the Vaser system, Emert reviewed the various terms of the agreement with Mohamed. Mohamed did not sign the agreement at that time. Instead, a few weeks after their initial meeting, Emert was informed that Mohamed had faxed the signed agreement to Sound Surgical's corporate office. After arranging for delivery of the Vaser system to Mohamed, Emert had a second meeting with Mohamed at his Beverly Hills office to set up the equipment and provide on-site training. She provided Mohamed with a one-page "Acceptance of Equipment" form which he also signed and returned to Sound Surgical. Emert never told Mohamed at any time that he owned the system.

Douglas Foote was general counsel for Sound Surgical. According to Foote, the three-page License and Use Agreement was the sole agreement used by the company to lease its medical devices. The first page of Mohamed's agreement stated that Sound Surgical granted Mohamed "'a nonexclusive and nontransferable license to use the equipment specified in schedule one,'" and "'schedule one is attached to and incorporated in this agreement.'" The first page further provided that Sound Surgical "'retain[ed] at all times sole and exclusive ownership of the equipment specified in part A of schedule one.'" The second page stated that Mohamed would pay Sound Surgical "'a one time fee of $12,000 plus freight and applicable sales or use tax which will entitle you to ownership of all of the equipment in parts B, C and D of schedule one,'" as well as cover the cost of installation, training, and introductory marketing materials. The second page also specified that Mohamed would pay Sound Surgical a fee of $395 for each procedure performed using the system.[2] The third and final page of Mohamed's

---

[2] Using an electronic counter in the Vaser Amplifier that would record the number of procedures performed, a physician was required to regularly upload the data from the counter to a website maintained by Sound Surgical. There was no usage fee when a physician purchased the entire Vaser system.

3

agreement set forth schedule one and specifically listed the VentX Console, the Vaser Amplifier, and the Precision Fluid Management System in part A of that schedule. Mohamed's signature appeared on the second page of the agreement.

Following Mohamed's execution of the agreement, Sound Surgical mailed an invoice to him at his Encino office. The invoice listed the items that had been shipped to Mohamed at his Beverly Hills office and the initial amounts that he owed. The invoice showed a charge of $10,000 for the instrumentation set that Mohamed had purchased for use with the Vaser system, and no charge for the three main components of the system (the VentX Console, the Vaser Amplifier, and the Precision Fluid Management System). The invoice also showed a separate charge of $2,000 for installation of the system, plus an additional amount for shipping and sales tax. Although Mohamed made an initial payment of $2,000, he did not pay the balance due within 30 days as provided in the agreement. After repeated collection attempts by Sound Surgical, the matter was referred to Foote.

On February 18, 2008, Foote sent a letter to Mohamed stating that Sound Surgical previously had given him notice that it was terminating the agreement due to Mohamed's failure to pay an outstanding balance of $9,535.10. The letter also stated that Sound Surgical had attempted to retrieve the Vaser system from Mohamed's office pursuant to the lease termination and Mohamed had refused to release the system to its agent. Foote informed Mohamed that Sound Surgical had hired a California law firm to recover the system and the money owed, but offered him the option of returning the system and paying the sum of $8,600 as a final resolution of the matter.

On February 20, 2008, in response to Mohamed's request that the agreement not be terminated, Foote sent another letter to Mohamed setting forth a payment proposal. The letter stated that Sound Surgical would allow Mohamed to retain the Vaser system if he agreed to pay the total outstanding balance of $9,535 within one week and sign two authorization forms permitting Sound Surgical to withdraw future payments directly from his bank account and to charge his credit card in the event the automatic bank withdrawal ever failed. The letter included a line for Mohamed's signature. The following week,

4

Foote received from Mohamed the signed February 20, 2008 letter, two signed authorization forms, and a check for $9,535.10. Mohamed thereafter continued to use the Vaser system.

On May 20, 2009, Sound Surgical filed a Uniform Commercial Code (UCC) financial statement with the California Secretary of State certifying a lien on the Vaser components leased to Mohamed, including the VentX Console, the Vaser Amplifier, and the Precision Fluid Management System. Prior to 2009, Sound Surgical had not filed UCC statements for any of its Vaser systems because it primarily sold the system rather than leased it. However, by 2009, the company determined that it had leased a large number of Vaser systems to physicians across the country and decided to protect its ownership interests in such property by filing UCC statements.

In June 2010, Mohamed notified Sound Surgical that the Vaser Amplifier component of the system was not working properly. Sound Surgical provided Mohamed with a loaner amplifier while it serviced the original part, which it then returned to Mohamed. At some later point, Mohamed again became delinquent in his usage payments. Sound Surgical terminated the agreement at that time and demanded that Mohamed return the Vaser system and pay the money owed. Mohamed offered to pay the outstanding balance, but refused to return the system.

In late 2010, Sound Surgical hired a California attorney, Dean Prober, to recover both the Vaser system and the unpaid balance from Mohamed. After sending a demand letter to Mohamed, Prober filed a civil complaint against him along with an application for a prejudgment writ of possession. At a December 2010 hearing attended by Prober and Mohamed's attorney, the trial court in the civil matter denied the writ application without prejudice. On April 7, 2011, Prober sent another letter to Mohamed reiterating that Sound Surgical had terminated the License and Use Agreement. The letter also stated that Mohamed was still liable to Sound Surgical for the amounts past due and was required to make the Vaser system available for repossession pursuant to the terms of the agreement. The letter was sent to Mohamed via fax, email, and certified mail at his offices in Beverly Hills and Encino, but no response was received.

In July 2011, Nikki Rasmussen, the owner of a medical spa in Connecticut, was interested in purchasing a liposuction system. She saw a listing for a Vaser system on eBay with a starting bid of $20,000 and a "buy it now" price of $30,000. Based on her research, Rasmussen was aware that the Vaser system could be either purchased or leased and included three major pieces of equipment, each with its own identifying information. Rasmussen sent a message to the seller through the eBay website asking various questions about the advertised Vaser system, including whether the seller was the original owner. She received a response from Mohamed stating that he was the original owner and a cosmetic surgeon liquidating his practice and moving abroad.

Rasmussen subsequently communicated with Mohamed via telephone and email about a potential sale. Mohamed indicated that he did not have a bill of sale or cancelled check confirming his original purchase, but assured Rasmussen that he owned the system outright. Mohamed also conveyed a sense of urgency in completing the transaction and repeatedly called Rasmussen asking how soon she could send a check. Rasmussen offered to purchase the system for $19,000 provided that Mohamed signed a release stating that there were no outstanding liens. In response, Mohamed sent an email to Rasmussen in which he represented that the system was paid for in full at the time of purchase and that Sound Surgical did not accept leases. Mohamed told Rasmussen that she could check for any UCC filings on liens. Mohamed also sent Rasmussen an invoice reflecting an asking price of $20,000 and stating that title to the system was clear and free from any liens, leases, or loans.

Using one of the serial numbers shown in photographs of the system provided by Mohamed, Rasmussen checked for UCC filings on the system and contacted Sound Surgical. After being informed by Sound Surgical that the system was not owned by Mohamed, Rasmussen contacted the Los Angeles Police Department on or about July 20, 2011 to report her concern that Mohamed was attempting to sell property to her that he did not own. Detective Lisa Lawson investigated Rasmussen's report and then set up a sting operation involving 10 officers to take place at Mohamed's office.

6

At Detective Lawson's direction, Rasmussen arranged a meeting with Mohamed regarding her purchase of the Vaser system.

On July 22, 2011, undercover officers Denise Estrada and her partner posed as representatives for Rasmussen and met with Mohamed at his Encino office.[3] Officer Estrada told Mohamed that she was there to inspect the Vaser system and would purchase the system on Rasmussen's behalf if the parts matched the information in the invoice. Mohamed showed Officer Estrada the various components of the Vaser system and demonstrated that the system was in working condition. After confirming that the serial numbers on the three main components matched those provided by Detective Lawson, Officer Estrada told Mohamed that she had to call Rasmussen. Mohamed escorted Officer Estrada to his office where she placed an envelope containing a check on the desk directly in front of her. She then called her supervisor and gave a predetermined signal to enter the premises. When Officer Estrada ended the call, she saw that the envelope had been moved across the desk close to Mohamed. Other officers arrived on the scene and placed Mohamed under arrest.

Detective Lawson subsequently interviewed Mohamed at the police station. Mohamed repeatedly stated in the interview that he believed he owned the Vaser system. When shown the three-page License and Use Agreement, Mohamed acknowledged that his signature appeared on the second page of the document, but insisted he had never seen the third page. He asserted that the lease aspect of the agreement solely pertained to his use of the technology associated with the system. Mohamed also indicated that he was involved in an ongoing litigation with Sound Surgical over the system and that the trial court's refusal to issue a writ of possession to Sound Surgical proved he was the rightful owner.

---

[3]     On June 16, 2011, Mohamed was evicted from his Encino office due to his failure to pay the rent, but was allowed limited access to the office on July 22, 2011 by building management for the purpose of removing his belongings.

## II.     Defense Evidence

Mohamed testified on his own behalf.  On July 30, 2007, Mohamed met with Emert at his office.  Emert was a "slick" salesperson and seemed anxious for Mohamed to sign a contract.  She did not advise Mohamed to read the contract carefully, but rather stated that he should glance at it and sign it if he wanted the Vaser system.  Emert never mentioned the term "license" or "lease" in their meeting.  When Mohamed asked Emert about the term "license agreement," she explained that it was similar to a cell phone contract where the customer purchased the phone and paid the provider for minutes used.  She told Mohamed that he was buying the system for $12,000 and that Sound Surgical would charge him $395 for each procedure performed.  When Mohamed asked if the agreement was similar to a software license, Emert answered in the affirmative.  Based on Emert's statements, Mohamed believed he was purchasing the Vaser system and obtaining a license to use the technology associated with the system.  Emert never provided Mohamed with the third page of the agreement.  Mohamed solely signed the second page of the agreement during their meeting and was unaware there was a third page.  Emert also did not provide Mohamed with a copy of the agreement for his records.

In Mohamed's experience with leasing other types of medical equipment, both the contract language and the sales representative made clear that the equipment was being leased.  Mohamed also understood there was an important tax distinction between leasing and purchasing medical equipment because leased equipment was fully deductible whereas purchased equipment was subject to a depreciation schedule.  Because Mohamed believed he owned the Vaser system, he treated it as a depreciated asset for tax purposes.  In 2007 or 2008, Mohamed verified there were no UCC filings relating to his Vaser system, which reinforced his belief that he owned the system outright.

In early 2008, Mohamed had a telephone conversation with Foote about a bounced check.  Foote did not mention that Sound Surgical owned Mohamed's Vaser system or that the system was subject to a lease agreement.  Mohamed never saw Foote's February 20, 2008 letter, but was told by his office manager that they were past due on a payment under the purchase agreement.  Mohamed directed his office manager to make

8

the payment and believed that his office manager likely signed Mohamed's name to the letter and returned it with a check to Sound Surgical.

On several occasions between 2008 and 2010, representatives from Sound Surgical attempted to repossess the Vaser system from Mohamed whenever he failed to timely make a payment, but Mohamed refused to relinquish the system because he believed he owned it. In July 2010, Mohamed contacted Sound Surgical for assistance when his Vaser Amplifier stopped working. Sound Surgical provided him with a loaner amplifier while it made the necessary repairs and then returned the original part to him. Mohamed believed Sound Surgical would not have returned the Vaser Amplifier to him if he was not the rightful owner of the system.

In October 2010, Mohamed received a letter from Sound Surgical advising him that it was terminating the lease and referring the matter to a California attorney. An attorney representing Sound Surgical thereafter applied for a writ of possession for Mohamed's Vaser system. The trial court refused to grant the writ of possession, leading Mohamed to believe Sound Surgical had no right of ownership in the system. Mohamed was aware that Sound Surgical was still trying to recover an unspecified amount of damages in its civil suit, but believed the issue of title to the system had been resolved in his favor by the trial court's ruling. In January 2011, Mohamed closed his Encino office and allowed the lease to terminate. As a result, he never received the April 2011 letter from Sound Surgical's attorney.

In July 2011, Mohamed posted an advertisement on eBay seeking to sell all of his office furniture and equipment because he was moving overseas. When Mohamed corresponded with Rasmussen about the sale of his Vaser system, her only stated concern was whether he owned the system outright. Mohamed encouraged Rasmussen to check for any UCC filings as he previously had done to ensure the title was clear. He did not intend to mislead Rasmussen and was shocked by his arrest. Throughout his interview with Detective Lawson, Mohamed maintained his innocence and his belief that the Vaser system belonged to him. When Detective Lawson showed Mohamed the third page of the License and Use Agreement, he assured her that he had never seen that page before.

9

Mohamed now understood that he did not own the main components of the Vaser system based on the third page of the agreement, but sincerely believed he was the rightful owner until the time of his arrest.

## III.    Verdict and Sentencing

During deliberations, the jury initially informed the trial court that it was deadlocked on the issue of whether Mohamed had a good faith belief that owned the Vaser system. In response, the trial court permitted the prosecution and defense to reopen closing arguments to address the issue raised by the jury. Following further argument by counsel and deliberations, the jury found Mohamed guilty of both counts of attempted grand theft of personal property. Mohamed was sentenced to a total term of one year in county jail. He thereafter filed a timely notice of appeal.

## DISCUSSION

On appeal, Mohamed challenges the sufficiency of the evidence supporting his conviction of each count of attempted grand theft. To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for

10

insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

In count one, Mohamed was charged with and convicted of the attempted grand theft of the main components of the Vaser system from Sound Surgical. In count two, Mohamed was charged with and convicted of the attempted grand theft of $20,000 from Rasmussen. Although the jury was instructed on the elements of attempted grand theft by larceny, embezzlement, and false pretenses, the prosecution's theory at trial was that Mohamed attempted a theft by embezzlement as to count one and attempted a theft by false pretenses as to count two. To support a conviction of theft by embezzlement, it must be shown that (1) an owner entrusted his or her property to the defendant; (2) the owner did so because he or she trusted the defendant; (3) the defendant fraudulently converted that property for his or her own benefit; and (4) when the defendant converted the property, he or she intended to deprive the owner of its use. (*People v. Beaver* (2010) 186 Cal.App.4th 107, 121; CALCRIM No. 1806.) To support a conviction of theft by false pretenses, it must be shown that (1) the defendant made a false pretense or representation to the owner of property; (2) the defendant did so with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation. (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842; CALCRIM No. 1804.) An attempted grand theft requires proof that the defendant intended to commit a grand theft of personal property and took a direct but ineffective step toward the commission of that crime. (§ 21a; CALCRIM No. 460.)

At trial, Mohamed's defense to each count was that he reasonably believed he owned the entire Vaser system and thus lacked the requisite mental state for an attempted grand theft. "An essential element of any theft crime is the specific intent to permanently deprive the owner of his or her property. [Citation.] A good faith belief by a defendant that the property taken is his own has long been accepted as a complete defense to theft-related crimes." (*People v. Williams* (2009) 176 Cal.App.4th 1521, 1526-1527.) As our Supreme Court has explained, "'[a]lthough an intent to steal may ordinarily be inferred

11

when one person takes the property of another, . . . proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule . . . that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.] . . . . Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it. [Citation.]' [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1143.) However, "'"[w]hether a claim is advanced in good faith does not depend solely upon whether the claimant believes he was acting lawfully; the circumstances must be indicative of good faith." [Citations.]'" (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1428.)

On appeal, Mohamed relies on the mistake-of-fact defense to support his argument that each of his convictions must be reversed for lack of sufficient evidence. He specifically asserts that the only reasonable inference that could be drawn from the evidence was that he had a good faith, albeit mistaken, belief that he owned the Vaser system outright. Contrary to Mohamed's contention, however, there was substantial evidence supporting his convictions. The jury was instructed on the mistake-of-fact defense and heard the testimony offered by Mohamed regarding his asserted good faith belief, but it ultimately rejected the defense in reaching its guilty verdicts.[4] While we must ensure that the evidence at trial was reasonable, credible, and of solid value, it was for the jury, not this court, to weigh the credibility of the witnesses and resolve any conflicts in the evidence.

---

[4] The jury was instructed on the mistake-of-fact defense with CALCRIM No. 3406 as follows: "The defendant is not guilty of attempted grand theft if he did not have the intent required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as he reasonably believed them to be, he did not commit attempted grand theft. [¶] If you believe the defendant believed that he owned the equipment in question and you find that belief was reasonable, he did not have the specific intent required for attempted grand theft. [¶] If you have a reasonable doubt about whether the defendant had the specific required for attempted grand theft, you must find him not guilty of that crime."

The evidence in this case established that Mohamed and Sound Surgical entered into a three-page License and Use Agreement which granted Mohamed a license to use the three main components of the Vaser system in exchange for an initial fee of $12,000 and a usage fee of $395 for each procedure performed with the system. The agreement stated that Sound Surgical would retain sole ownership of the system's three main components while Mohamed would own the remaining smaller instruments. Mohamed signed the License and Usage Agreement and later received an invoice reflecting a charge of $10,000 for the instrumentation set, a charge of $2,000 for installation, and no charge for the three main components of the Vaser system. Based on the plain language of the agreement and the invoice, the jury reasonably could have inferred that Mohamed knew that he was leasing rather than purchasing the main components of the system.

Although Mohamed argues on appeal that ambiguities in the language of the License and Usage Agreement supported his mistake-of-fact defense, he admitted at trial that the third page of the agreement showed he did not actually own the main components of the Vaser system. Mohamed insisted, however, that he never saw the third page until his arrest. He also maintained that Emert, the territory manager for Sound Surgical who proposed the Vaser system to him, told Mohamed that he was purchasing the entire system for $12,000 and paying an additional fee of $395 for each procedure performed. In contrast, Emert specifically testified that she explained the terms of the License and Usage Agreement to Mohamed during their initial meeting, provided him with the complete three-page agreement for his signature, and never told him at any time that he owned the Vaser system outright. While Mohamed's version of events directly contradicted that of Emert, it was the exclusive province of the jury "'to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) It appears that the jury chose to credit the testimony of Emert as it was entitled to do.

The evidence at trial further showed that two attorneys representing Sound Surgical, Foote and Prober, repeatedly corresponded with Mohamed about Sound Surgical's intent to enforce its ownership rights in the Vaser system. Foote testified that

13

he sent written correspondence to Mohamed on multiple occasions in February 2008 regarding Mohamed's failure to pay the amounts owed under the License and Use Agreement and Sound Surgical's attempts to repossess the system based on Mohamed's noncompliance with the agreement. Although Sound Surgical ultimately permitted Mohamed to continue using the system following his payment of the outstanding balance, he again became delinquent in his usage payments and Sound Surgical decided to terminate the lease at that time. Prober testified that he sent demand letters to Mohamed in 2010 and 2011 notifying him that Sound Surgical had terminated the License and Use Agreement and that Mohamed was required to make the Vaser system available for repossession under the terms of the agreement. When Mohamed refused to allow Sound Surgical to remove the Vaser system from his office, Sound Surgical filed a civil action to repossess the system and recover the amounts owed.

Mohamed asserts that his resistance to Sound Surgical's attempts to repossess the Vaser system reflected his reasonable belief that he was the rightful owner of the system. He also argues that the trial court's refusal to grant Sound Surgical's application for a prejudgment writ of possession reinforced his good faith belief that any dispute over ownership had been resolved in his favor. However, the jury reasonably could have found that Sound Surgical's actions in repeatedly demanding that Mohamed return the Vaser system and then initiating a civil suit when he refused to do so put Mohamed on notice that the company was claiming an ownership interest in the system. At that point, Mohamed could no longer rely in good faith on his prior search for UCC filings on the system or Sound Surgical's prior technical support to conclude that he owned the system outright. The jury also could have found that Mohamed did not have a good faith belief that the trial court's December 2010 ruling on the writ application had fully resolved the matter given his admission to the police that he was involved in an ongoing litigation with Sound Surgical over the Vaser system at the time of his July 2011 arrest.

There was also evidence presented at trial that, while the civil litigation with Sound Surgical was still pending, Mohamed posted an advertisement for the sale of Vaser system on eBay and negotiated a sale price of $20,000 with Rasmussen after initially

14

listing a price of $30,000. In response to Rasmussen's stated concerns about whether title to the property was free and clear, Mohamed represented to her that he owned the system outright and had paid for it in full at the time of purchase. Mohamed never provided Rasmussen with a copy of the License and Use Agreement nor disclosed to her that the Vaser system in his possession was the subject of an ongoing litigation with Sound Surgical. Mohamed points out that he advised Rasmussen to check for any UCC filings on the Vaser system and claims he would not have done so unless he believed that he owned the system outright. However, the jury reasonably could have inferred that Mohamed's failure to disclose the ongoing litigation with Sound Surgical over the system demonstrated that he was not acting in good faith when he represented to Rasmussen that title to the property was free and clear. The jury also could have inferred that Mohamed's attempt to sell a used medical device to Rasmussen for a significantly higher sum than he had initially paid to Sound Surgical showed that he knew he had leased the Vaser system rather than purchased it.

Under these circumstances, there was substantial evidence to support a finding that Sound Surgical entrusted the main components of the Vaser system to Mohamed for use under a lease agreement and that Mohamed attempted to fraudulently convert those components for his own benefit when he offered to sell the complete Vaser system to Rasmussen. There was also substantial evidence to support a finding that Mohamed fraudulently represented to Rasmussen that he owned the system outright and that he did so in an attempt to persuade Rasmussen to pay him $20,000 for property that he knew belonged to Sound Surgical. While Mohamed points to evidence in the record that arguably could support a mistake-of-fact defense, it ultimately was up to the jury to determine whether to accept such evidence as true. In light of the substantial evidence presented that Mohamed knew he did not own the property at issue, the jury's rejection of the mistake-of-fact defense was reasonable. Mohamed's conviction of each count of attempted grand theft was accordingly supported by substantial evidence.

15

## DISPOSITION

The judgment is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

16