[No. C059218. Third Dist. Aug. 26, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY WILLIAMS, Defendant and Appellant.

COUNSEL

Syda Kosofsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BUTZ, J.—Defendant Anthony Williams was charged with burglary (Pen. Code, § 459)[1] and robbery (§ 211), with special allegations that he personally used a firearm (§ 12022.53, subd. (b)) in the commission of the offenses. The jury convicted him of burglary and found the gun allegation to be true, but acquitted him of the robbery.[2]

Sentenced to an aggregate term of eight years in state prison, defendant appeals. The issue in this case is whether a defendant charged with burglary on an aiding and abetting theory with a target crime of larceny is entitled to have the jury instructed on the claim-of-right defense, where there is substantial evidence that the defendant, in good faith, believed the property taken from the victim belonged to his coprincipal.

We agree with defendant that the trial court erred in refusing a claim-of-right instruction, but find the error to be harmless. Thus, we shall affirm the judgment.

## FACTUAL BACKGROUND

On the evening of August 27, 2007, Marlene Ayers (Marlene) and her three female cousins, including Johneshia Daniels, were all gathered at Daniels's apartment in Rio Linda. Around 10:00 p.m. there was a knock on the door. Marlene asked, "Who is it?" and defendant answered, "Anthony." When Marlene opened the door, she saw defendant, his brother Kendall Williams (Kendall), who was Marlene's ex-boyfriend, and Kivon Holmes.[3] Marlene

---

[1] Undesignated statutory references are to the Penal Code.

[2] The trial included a second count of robbery involving a separate incident and different victim. The jury deadlocked on that count, and the facts of that case are not relevant to this appeal.

[3] Kendall and Holmes were named as codefendants in the original information, but the case went to trial solely against defendant.

tried to shut the door, but defendant pushed it open. Defendant and Kendall entered the room, while Holmes stood in the doorway.

Kendall directed defendant to pull out his gun. Defendant reached into his waistband, pulled out a handgun and began waving it around. Addressing Marlene, defendant said, "You thought this was a game" and "Bitch, you stole my brother's car." Kendall said "Where's my shit?" and demanded that Marlene surrender the car keys and a laptop computer. Marlene directed Kendall to the car keys and told him the laptop was in the car. Kendall grabbed the keys and the men left. As he departed, defendant said, "Have a nice day." One of the three men drove away in Marlene's 1996 Aurora, which contained her laptop computer, as well as miscellaneous personal items.

Marlene testified that she and Kendall had lived together and dated intermittently until the beginning of August 2007, when they had an acrimonious breakup. She stated that she bought the Aurora from a third party, using Kendall as an intermediary. She admitted that Kendall tendered the purchase price to the seller and drove the car home, but insisted the car was purchased with her money. She acknowledged that the paperwork was still in the name of the seller, but explained that it was because neither she nor Kendall had a driver's license. She purchased the laptop at Best Buy with money received as a birthday present, although Kendall occasionally used it.

*Defense*

Defendant testified that the Aurora belonged to his brother Kendall and that he was present when Kendall purchased it. After Kendall and Marlene broke up, he and Holmes agreed to accompany Kendall to the apartment where Marlene was staying, in order to get the car back.

Defendant testified that he knocked on the door, and when Marlene asked who it was, he said, "Anthony." According to defendant, Marlene opened the door and "jumped back," allowing the men to enter the room unimpeded. Kendall demanded the keys to his car and his laptop. Marlene surrendered the keys and told him that his laptop was in the car. Defendant denied either owning or possessing a gun that evening, remarking "We didn't feel we needed a gun to go get our own property from some females." Defendant testified that he was the one who drove the Aurora away from Daniels's apartment.

Dierre Hudson, the registered owner of the Aurora, testified that he sold the car to Kendall. He produced a bill of sale, signed by him and Kendall. Admitting that Kendall was a friend of his, Hudson stated that he held back the pink slip because Kendall still owed him some money on the car.

## DISCUSSION

### I. Procedural Background

Prior to trial, the prosecutor moved in limine to preclude defendant from asserting a claim-of-right defense, contending that that defense has never been extended to a defendant who aids and abets another in retrieving the other person's property. In support of this position, the prosecutor cited *People v. Hargrove*, a case from this district that was ordered depublished by the California Supreme Court. (*People v. Hargrove* (Feb. 19, 2002, C032547) review den. and opn. ordered nonpub. May 15, 2002, S105439.) The trial court deferred ruling on the motion until it heard the evidence in the case.

Before the case went to the jury, defense counsel requested that the jury be instructed on the claim-of-right defense (see CALCRIM No. 1863). The trial court refused the instruction, stating its belief that a defendant charged as an accomplice may not raise the defense with respect to recovery of any property other than his own.

### II. The Trial Court Erred in Refusing to Instruct on the Claim-of-right Defense

Defendant was charged with both robbery and burglary in connection with the incident at Daniels's apartment. Attached to each of the counts was a personal firearm use allegation. Although the crime of false imprisonment was not charged, the jury was instructed on the elements of false imprisonment and advised that defendant could be found guilty of burglary if he intended to enter the apartment with the intent to commit either larceny or false imprisonment.

Citing substantial evidence in support of his claim that he was simply helping his brother take back his own property, defendant argues that the trial court erred in refusing to instruct the jury on the claim-of-right defense which, if credited by the jury, would have negated the specific intent required to commit larceny and robbery. The Attorney General urges us to reject defendant's "attempt[] to extend the claim-of-right defense to the recovery of a third party's property," pointing out that no California case has recognized such a defense, and urging that such an extension would be contrary to public policy.

■ An essential element of any theft crime is the specific intent to permanently deprive the owner of his or her property. (*People v. Avery* (2002) 27 Cal.4th 49, 54–55 [115 Cal.Rptr.2d 403, 38 P.3d 1].) A good faith belief by a defendant that the property taken is his own has long been accepted as a

complete defense to theft-related crimes. " ' "Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.] A belief that the property taken belongs to the taker [citations] . . . is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it." ' " (*People v. Tufunga* (1999) 21 Cal.4th 935, 943 [90 Cal.Rptr.2d 143, 987 P.2d 168] (*Tufunga*), quoting *People v. Barnett* (1998) 17 Cal.4th 1044, 1142–1143 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

 In *Tufunga*, the California Supreme Court refused to abrogate the claim-of-right defense to the crime of robbery, explaining: "[T]he Legislature over 100 years ago codified in the current robbery statute the common law recognition that a claim-of-right defense can negate the *animus furandi* element of robbery where the defendant is seeking to regain specific property in which he in good faith believes he has a bona fide claim of ownership or title. Whatever be our views on the wisdom of the Legislature's chosen delineation of the mental state necessary for robbery, the separation of powers clause (Cal. Const., art. III, § 3) prohibits this court from abolishing the claim-of-right defense altogether on policy grounds, as such would effectively alter a statutorily defined element of that offense by judicial fiat." (*Tufunga, supra*, 21 Cal.4th at p. 950.)

At the same time, the *Tufunga* court rejected the claim-of-right defense when force is used to collect on a debt, stating that "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated—as opposed to forcible takings intended to recover specific personal property in which the defendant in good faith believes he has a bona fide claim of ownership or title . . . [are] unsupported by the statutory language, [and] contrary to sound public policy . . . ." (*Tufunga, supra*, 21 Cal.4th at p. 956.)

The Attorney General frames the issue as whether this court should extend the claim-of-right defense to a robbery where the defendant harbors a good faith belief that the property belongs to someone else, as though the defendant was accused of committing the crime himself, as a lone vigilante. But that is not the issue that confronts us.

 Defendant was tried and the jury was instructed on a theory that he *aided and abetted* his brother Kendall in stealing property that belonged to Kendall's ex-girlfriend Marlene. The evidence showed the Williams brothers

acted in concert to take property by force or fear. The pivotal issue at trial was *who* was the rightful owner of the property. Thus, there is no question that, had Kendall been on trial for robbery and burglary, a claim-of-right instruction would not only have been proper, but mandatory. (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1429 [51 Cal.Rptr.3d 263] ["If the defendant relies on a claim-of-right defense or if there is substantial evidence that supports the defense and the defense is not inconsistent with the defendant's theory of the case, the trial court must instruct sua sponte on the defense."].)

█ "Except for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state, sometimes called the mens rea. (Pen. Code, § 20; see generally 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, §§ 1, 21, pp. 198–199, 227–228.) *This principle applies to aiding and abetting liability as well as direct liability.* An aider and abettor must do something *and* have a certain mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 [108 Cal.Rptr.2d 188, 24 P.3d 1210], some italics added.)

█ Defendant's guilt of robbery (and derivatively of burglary where the intent is to rob) requires not only that he commit the requisite act but also that he have the requisite specific intent. Since robbery was, at common law, simply an aggravated form of larceny, both crimes require that defendant act with the *felonious intent to take property that belongs to another.* (*Tufunga, supra,* 21 Cal.4th at pp. 945–946.) The claim-of-right defense is based on the sound concept that a person who acts under a good faith belief that he is repossessing his own property lacks felonious intent to deprive another of his or her property. (*Id.* at pp. 946–947.)

█ To be liable as a principal on an aiding and abetting theory, the accused must "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) Thus, "[w]hen the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must *share the specific intent of the perpetrator.*" (*Ibid.,* second italics added.)

█ It would defy logic and common sense to hold that a defendant who absconds with goods by force under a good faith belief that he was repossessing his own property does not thereby commit robbery, but that his accomplice, who assists him in the same act and shares the same intent, may be found guilty. The latter, just as surely as the former, lacks the specific intent to deprive another of his or her property. We therefore conclude that a good faith belief by a defendant, tried as an accomplice, that he was assisting

his coprincipal retake the principal's property negates the "felonious intent" element of both larceny and robbery, and that an instruction on the claim-of-right defense must be given where substantial evidence supports such a belief.

Defendant testified that he believed he was assisting Kendall retake Kendall's own property. There was ample evidence in the record to support a jury finding that such belief was harbored in good faith (see Discussion, pt. III). For that reason, the trial court erred in refusing to give a modified version of CALCRIM No. 1863.[4]

■ We note with concern that the prosecutor cited and the trial court seemed to be influenced by *People v. Hargrove*, an opinion that all parties knew had been ordered depublished by the California Supreme Court. (See Cal. Rules of Court, rule 8.1105(e).) We remind counsel that use of a depublished case for this purpose is absolutely prohibited by the California Rules of Court. (Cal. Rules of Court, rule 8.1115(a).) The rules authorize reference to unpublished opinions only in a narrow set of circumstances, none of which applied here. (See Cal. Rules of Court, rule 8.1115(b).) We realize that depublished and unpublished decisions are now as readily available as published cases, thanks to the Internet and technologically savvy legal research programs. That does not give counsel an excuse to ignore the rules of court. Indeed, persistent use of unpublished authority may be cause for sanctions. (See *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 885 [271 Cal.Rptr. 513].) Counsel would be well served to heed this advice by a leading treatise writer: "Do *not, under any circumstances*, cite to an *unpublished or depublished* opinion (or any *unpublished part* of a published opinion) . . . unless . . . one of the narrow exceptions to the noncitation rule applies . . . ." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2008) ¶ 9:59, p. 9-18 (rev. # 1, 2008).)

---

[4] In pertinent part, CALCRIM No. 1863 states:

"If the defendant obtained property under a claim of right, (he/she) did not have the intent required for the crime of (theft/ [or] robbery).

"The defendant obtained property under a claim of right if (he/she) believed in good faith that (he/she) had a right to the specific property or a specific amount of money, and (he/she) openly took it.

"In deciding whether the defendant believed that (he/she) had a right to the property and whether (he/she) held that belief in good faith, consider all the facts known to (him/her) at the time (he/she) obtained the property, along with all the other evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith. [¶ . . . ¶]

"If you have a reasonable doubt about whether the defendant had the intent required for (theft/ [or] robbery), you must find (him/her) not guilty of ____ <insert specific theft crime>."

### III. The Error Was Not Prejudicial

Having determined that the trial court erred in refusing to give a claim-of-right instruction, we must still decide whether the error was prejudicial.

Defendant suggests the error should be measured by the *Green/Guiton* test (*People v. Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468], overruled on different grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239 [83 Cal.Rptr.2d 533, 973 P.2d 512]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1122 [17 Cal.Rptr.2d 365, 847 P.2d 45]), which holds that "when the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand" (*Green*, at p. 69).

*Green* and *Guiton* are not applicable here. The prosecutor did not suggest, nor did the court instruct on, a legally erroneous theory of the case. The instructions were correct as far as they went. The problem here is they did not go far enough by failing to include the claim-of-right defense.

The California Supreme Court has not yet determined the standard of prejudice applicable to the erroneous failure to give a requested instruction on an affirmative defense. (*People v. Salas* (2006) 37 Cal.4th 967, 984 [38 Cal.Rptr.3d 624, 127 P.3d 40].)

We need not decide whether the error here must be judged by the federal constitutional "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711, 87 S.Ct. 824] (see *People v. Lewis* (2006) 139 Cal.App.4th 874, 884 [44 Cal.Rptr.3d 403]), or the more liberal "reasonable probability of a more favorable outcome" standard for ordinary trial error (see *People v. Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243]), because the error was harmless under either test.

With respect to the entry into Daniels's apartment, defendant was charged with burglary and robbery, with special allegations that he used a handgun in the commission of both crimes. The jury was instructed that defendant could be found guilty of burglary if he entered the apartment with the intent to commit *either* larceny or false imprisonment (or both). The trial court also instructed the jurors that to be guilty of larceny defendant had to take possession of property *owned by someone else* without the owner's consent, with the intent to deprive the owner of her enjoyment of the property.

The question of *whose property* was taken by the Williams brothers that night was zealously litigated. The evidence supporting Marlene's claim that

she owned the car and the laptop was not strong. All of the paperwork on the car was in Kendall's name, including the bill of sale. Marlene had no paperwork to support her claim of ownership and offered no reasonable explanation as to why she did not register the car in her name. The Best Buy receipt for the laptop had no name on it, and Marlene admitted that if Best Buy stored anyone's name in connection with the laptop it would have been Kendall's, since he brought it in to have antivirus software installed.

Defense counsel vigorously reminded the jury of these facts in her closing argument, urging the jury to find that "Anthony Williams is not guilty of the robbery charges nor the burglary charges involving Marlene Ayers because Marlene Ayers *was not the owner of the property taken that night.*" (Italics added.)

The jury swiftly returned a verdict finding defendant not guilty of robbery and not guilty of the lesser included offense of larceny. After prolonged further deliberation, the jury found him guilty of burglary and found the gun enhancement to be true.

The jury's rapid acquittal on both theft-related offenses meant that all 12 jurors had at least a reasonable doubt that defendant committed larceny (and, inferentially, robbery). That doubt was surely based on the problematical state of the evidence as to true ownership of the property, since it was undisputed that defendant and his brother intended to and in fact succeeded in carrying the property away.

Since larceny and false imprisonment were the only two permissible target crimes for the burglary charge, the only way the jury could have found defendant guilty of burglary after having acquitted him of larceny, would be to find that his intent in entering the apartment was to commit a *false imprisonment*, a conclusion that was amply supported by evidence in the record. No other scenario is plausible.

The manner in which the case was tried and argued to the jury, together with its aquittal verdicts on both theft-related offenses, demonstrates that the jurors resolved the question of *actual* ownership of the property adversely to the People. Thus, a claim-of-right instruction—which would have told the jury that defendant's *good faith belief* in Kendall's ownership of the property negated the intent element of both larceny and robbery—could not have influenced the verdict. The trial court's error in refusing to give the instruction was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment is affirmed.

Robie, J., concurred.

**SIMS, Acting P. J.,** Concurring.—I concur in the majority opinion.

I write separately to explain the counterintuitive proposition that defendant was entitled to a claim-of-right defense instruction even though he used a gun in his attempt to reclaim his brother's car.

In *People v. Butler* (1967) 65 Cal.2d 569 [55 Cal.Rptr. 511, 421 P.2d 703] (*Butler*), the defendant, armed with a handgun, went to his employer's home to try to collect wages due the defendant for catering work. (*Id.* at p. 571.) During an altercation, the defendant shot and killed his employer with the handgun. (*Id.* at pp. 571–572.) The defendant was convicted of felony murder. (*Id.* at p. 571.)

In an opinion by Chief Justice Traynor, a majority of the Supreme Court held that the trial court erroneously allowed the prosecutor to argue that a claim-of-right defense did not exist in these circumstances. (*Butler, supra,* 65 Cal.2d 569, 572.)

In *People v. Tufunga* (1999) 21 Cal.4th 935 [90 Cal.Rptr.2d 143, 987 P.2d 168], the court disapproved *People v. Butler, supra,* 65 Cal.2d 569, to the extent it allowed a claim-of-right defense to collect a debt. (*Tufunga, supra,* at pp. 953–954.) However, the *Tufunga* court held that *Butler* is still viable where a defendant tries to reclaim specific personal property, where the defendant in good faith believes he has a bona fide claim of ownership or title to the property. (*Tufunga, supra,* at p. 956.)

Here, defendant assisted his brother in trying to reclaim a specific item of personal property—a car. *Tufunga* teaches that, in these circumstances, *Butler* remains viable. Thus, a claim-of-right defense is available even though, as in *Butler*, defendant used a gun.

Justice Mosk dissented in *Butler. (Butler, supra,* 65 Cal.2d at pp. 576–578 (dis. opn. of Mosk, J.).) He said, "In a bucolic western scene or in the woolly atmosphere of the frontier in the nineteenth century, the six-shooter may have been an acceptable device for do-it-yourself debt collection. If the law permitted a might-makes-right doctrine in that milieu, it is of dubious adaptability to urban society in this final third of the twentieth century." (*Id.* at p. 577 (dis. opn. of Mosk, J.).)

Justice Mosk was right then. He would be even more right in this first third of the 21st century.

A petition for a rehearing was denied September 3, 2009, and appellant's petition for review by the Supreme Court was denied December 2, 2009, S176710.