Filed 5/29/14  P. v. Miller CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065282 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF026737) |
| | (Super. Ct. No. SWF027400) |
| PAUL BRIAN MILLER, JR., et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Riverside, Mark A. Mandio, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant Paul Brian Miller, Jr.

Renee Rich, under appointment by the Court of Appeal, for Defendant and Appellant Alejandro Gallardo.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

Paul Brian Miller, Jr., and Alejandro Gallardo separately appeal their convictions of first degree robbery and first degree burglary following their joint Riverside County jury trial.

The amended information charged Miller and Gallardo jointly with the following four offenses: (1) first degree robbery in an inhabited dwelling (count 1: Pen. Code,[1] §§ 211, 212.5, subd. (a)); (2) carjacking (count 2: § 215, subd. (a)); (3) first degree burglary in an inhabited dwelling (count 3: § 459); and (4) making a criminal threat (count 4: § 422). Gallardo was separately charged with the following four additional offenses: (1) possession of a firearm (a shotgun) by a person previously convicted of a violent offense (count 5: former § 12021.1, subd. (a)); (2) possession of ammunition by a person prohibited from owning and possessing a firearm (count 6: former § 12316, subd. (b)(1)); (3) possession of methamphetamine (count 7: Health & Saf. Code, § 11377, subd. (a)); and (4) possession of drug paraphernalia (count 8: Health & Saf. Code, § 11364).

The information also alleged as to counts 1 through 4 that Miller personally used a firearm (a handgun) (counts 1 and 2: §§ 12022.53, subd. (b), 1192.7, subd. (c)(8); counts 3 and 4: § 12022.5, subd. (a), 1192.7, subd. (c)(8)); and that Gallardo participated as a

---

[1] All further statutory references will be to the Penal Code unless otherwise specified.

principal knowing that another principal (Miller) was armed with a firearm (counts 1-4: § 12022, subd. (a)(1), 1192.7, subd. (c)(8)).  It was also alleged that Miller committed the offenses charged in counts 1 through 4 while released from custody pending trial on a felony offense (§ 12022.1).  It was further alleged that Gallardo served three prior prison terms (§ 667.5, subd. (b)), had one serious felony prior (§ 667, subd. (a)), and had one prior strike conviction (§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)).

After the jury was sworn and before opening statements, Gallardo pleaded guilty to counts 5 through 8.  During trial, the court granted the prosecution's motion to dismiss count 4 (criminal threat) as to Gallardo.

The same jury found both defendants guilty of first degree robbery (count 1) and first degree burglary (count 3), found both not guilty of carjacking (count 2), and found Miller not guilty of making a criminal threat (count 4).  The jury found Miller committed his offenses in this case while released from custody pending trial on a felony offense.  The jury found the firearm allegations not true as to both defendants.  In a bifurcated proceeding, Gallardo admitted the prior prison term allegations, the prior serious felony conviction allegation, and the prior strike allegation.

The court sentenced Gallardo to a total state prison term of 21 years 8 months.  The sentence consists of 12 years (double the upper term) for his count 1 robbery conviction, two consecutive terms of 16 months (one-third the midterm, doubled) for his convictions of counts 5 and 7, a concurrent term for count 6, a concurrent term for count 8, a consecutive term of five years for the prior serious felony true finding, and two

3

consecutive one-year terms for two of the prison prior true findings. The court stayed under section 654 the term for Gallardo's burglary conviction.

The court sentenced Miller to the upper prison term of six years for his robbery conviction and the upper term of six years for his burglary conviction, but stayed the latter sentence under section 654. The court struck the finding on the section 12022.1 enhancement because the underlying offense resulted in a misdemeanor conviction rather than a felony. As a result, the court sentenced Miller to a total state prison term of six years.

*Contentions*

Miller and Gallardo contend their convictions of first degree robbery and first degree burglary must be reversed because the court prejudicially erred in denying their request that the court instruct the jury under CALCRIM No. 1863 on the claim-of-right defense. Gallardo alone also contends his robbery and burglary convictions must be reversed because the court abused its discretion under Evidence Code sections 352 and 1101, and violated his right to federal due process, by admitting irrelevent and prejudicial evidence that he was in possession of a shotgun when he was found in a treehouse and arrested in this matter. We affirm the judgments.

FACTUAL BACKGROUND

A. *The People's Case*

1. *The September 2008 robbery*

Kevin Ross, the victim in this case, lived in Temecula and had an online business selling used computer and electronics equipment. After arriving home in the evening on

4

September 9, 2008, Ross heard someone at his front door. He opened the door to see who was outside. Ross testified he went outside and spoke to two men, whom he identified at trial as the defendants, who said they were Ross's neighbors. Ross told them they were not his neighbors, asked them what they wanted, and then told them to leave his property.

When the men did not leave, Ross threatened to get a gun hoping this would scare them away. As Ross tried to run back into his house, Gallardo and Miller rushed him and threw him to the ground before he could close and lock the door. One of the men, who Ross believed was Miller, placed a black semiautomatic handgun to his head while he was face-down on the ground, causing a cut that bled down the side of Ross's head. The defendants took Ross to his office.

As Ross was on his knees, Miller pointed the gun at him and told him he (Ross) had taken $28,000 "from somebody" and they were there to "take things" from Ross. Ross, who was scared, replied he did not take any money, but they could take whatever they wanted. Gallardo and Miller wanted to know where the valuables were, and Ross pointed to a shelf underneath a television set where he had between $300 and $600. He asked defendants not to hurt him. Miller began waiving the gun around, pointing it at a computer and threatening to shoot Ross's dog.

Defendants took the cash and a digital camera and started to leave. Miller told Ross, "If you didn't take money from us, we will give you your stuff back." He also told Ross in a threatening manner they would come back and kill him if he called the police.

5

As the defendants left, they took Ross's car keys and wallet, which were on the kitchen counter, as well as his cell phone and his car.

Ross called the police. 1(2RT 165:7-9)! When the police arrived, they found Ross frantic and scared and saw blood coming down the side of his face.

2. *The police investigation and the defendants' arrest*

Police investigators obtained Miller's fingerprints from Ross's front door and office door. Police obtained the number of a cell phone belonging to Miller and, after obtaining a search warrant, obtained phone records that showed a one-minute outgoing call at 7:37 p.m. on September 9, 2008. Using information regarding the location of cell towers in the area, it was determined the phone was located in the area of Ross's residence at the time of the call. Miller had a contact named "Alex" listed in his cell phone, which referred to Gallardo. Ross later identified Miller and Gallardo from photographic lineups.

Ross's vehicle was recovered a few weeks later. His wallet, cash, and camera were not recovered.

In late September 2008, about two weeks after the incident at Ross's home, Miller was arrested at the Southwest Justice Center when he appeared there on another matter. When interviewed by the police, Miller was told why he was under arrest. Miller did not deny involvement, explained his name was "big on the fuckin['] streets," immediately offered to work out a deal with the police, and wanted to talk about what he could do for the sheriff's department in lieu of going to jail. With respect to the robbery, Miller said "shit doesn't happen unless fuckin['] there's a reason for it," "people steal from other

6

people," "somebody owed" someone money, "sometimes people fuckin['] want their money back." Miller indicated he got Ross's name on a piece of paper from someone, and he did it for money for his (Miller's) family because he was "dead broke."

In early December 2008, SWAT officers served a search warrant on Gallardo's parent's property in Lake Elsinore. They found and arrested Gallardo, who was hiding in a treehouse on the property. Officers found a pistol-grip shotgun in the treehouse. When interviewed by the police, Gallardo did not want to talk about the case. Gallardo indicated he had knowledge of a robbery in Temecula and about what happened to the victim, but he denied any involvement.

3. *The alleged theft from Murphy on June 22, 2008*

On June 22, 2008, about two-and-a-half months before the robbery of Ross, Ross went with his mother to help her look for a house to purchase in the Temecula area. They went to the home of a woman whose last name was Murphy, who was busy with her children and told Ross and his mother to look around on their own. Ross and his mother did so and then left after deciding they were not interested in purchasing the property.

Shortly thereafter, Ross's mother received a call from Murphy, who accused her of taking $28,000 from the house. Murphy called three more times and left messages repeating her accusations. At trial, Ross denied he or his mother took any money. During their investigation, the police found no evidence that Ross had stolen money from Murphy. Murphy spoke with the police on the telephone at least six times and said she believed Ross took $28,000 from her house. However, she canceled her in-person interview with the police about an hour before she was to arrive at the police station and

7

explained that her legal counsel advised her she should not speak any further to the police.

B. *Defense*

Defendants presented no evidence.

DISCUSSION

I. *FAILURE TO INSTRUCT SUA SPONTE ON THE CLAIM-OF-RIGHT DEFENSE*

Miller and Gallardo contend their convictions of first degree robbery and first degree burglary must be reversed because the court prejudicially erred in denying their request that the jury be instructed under CALCRIM No. 1863 on the claim-of-right defense.[2] We reject this contention.

---

2    CALCRIM No. 1863 provides:  "If the defendant obtained property under a claim of right, (he/she) did not have the intent required for the crime of (theft/ [or] robbery) [¶] *The defendant obtained property under a claim of right if* (*he/she*) *believed in good faith that* (*he/she*) *had a right to the specific property or a specific amount of money and* (*he/she*) *openly took it*. [¶] In deciding whether the defendant believed that (he/she) had a right to the property and whether (he/she) held that belief in good faith, consider all the facts known to (him/her) at the time (he/she) obtained the property, along with all the other evidence in the case.  The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable.  But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith. [¶] [The claim-of-right defense does not apply if the defendant attempted to conceal the taking at the time it occurred or after the taking was discovered.] [¶] [*The claim-of-right defense does not apply to offset or pay claims against the property owner of an undetermined or disputed amount*.] [¶] . . . [¶] If you have a reasonable doubt about whether the defendant had the intent required for (theft/ [or] robbery), you must find (him/her) not guilty. . . ."  (Italics added.)

8

A. *Background*

Following the close of evidence, Miller and Gallardo requested that the court instruct the jury with CALCRIM No. 1863 (see fn. 2, *ante*) regarding the claim-of-right defense. Gallardo's counsel asserted there was substantial evidence the defendants went to Ross's house to obtain "their money – one or both of their money." Specifically, counsel argued that during Ross's police interview, Ross told the police the defendants told him that he (Ross) stole $28,000 from them and that defendants referred to the money as theirs.

Miller's counsel supported Gallardo's argument by relying on Ross's following statement to the police as evidenced by the transcript of his police interview that was admitted in evidence:[3] "[A]nd then they started going on about how they were saying that I had stolen [$28,000] from them and they were insistent on that and they said where's the money? . . . [T]hey were insistent about the [$28,000]." Miller's counsel also relied on evidence showing that Murphy had accused Ross and his mother of stealing $28,000 and that defendants went to Ross's home to get the money back.

The prosecutor opposed the defendants' request for a claim-of-right defense instruction for several reasons. Acknowledging the evidence showed a woman named Murphy had accused Ross of stealing $28,000 from her home, the prosecutor argued that CALCRIM No. 1863 itself states that the claim-of-right defense does not apply to offset or pay claims against the property owner of an undetermined or disputed amount. The

---

[3] The recording of Ross's police interview was played for the jury.

9

prosecutor noted that here the amount was disputed because defendants claimed Ross owed $28,000, and Ross claimed he owed nothing. Noting that Murphy's statements to the police were not admitted for the truth of the matter, the prosecutor indicated the claim-of-right defense would apply if the evidence showed *Murphy* had gone into Ross's house to reclaim $28,000 that she believed was stolen from her, but this was not the case here. The prosecutor asserted that "sending two other individuals to do your dirty work due to your mistaken belief does not qualify under Claim of Right."

The court indicated it was not inclined to give the instruction on the claim-of-right defense, stating that "there has to be evidence [Miller and Gallardo] actually have a claim of right, which I interpret to be that they have some claim through ownership of that money." The court noted that "the best evidence" supporting defendants' request for the claim-of-right defense instruction was Ross's statement to the police that during the incident defendants were saying he had stolen $28,000 from them. However, the court stated that "every other piece of evidence in this case, including other portions of [Ross's] interview" clearly showed Ross believed the defendants were "talking about $28,000 [Murphy] claimed was stolen from her." The court also noted the evidence was not clear that the defendants were at Ross's home to collect the money and stated that they "could have simply been there opportunistically, having found out about a theft." The court then stated there was no substantial evidence to show the defendants "have [a] claim of right or could ever assert a claim of right in this case."

Indicating that a claim of right defense does not apply if the defendant attempted to conceal the taking, the court stated that Miller and Gallardo both "denied that they

10

were there" and, "[i]f [Ross] is to be believed, both of them . . . left the scene with items they took" and "[t]hey never returned them[,] never displayed them to the police[,] and never asserted claim of right to the police."  The court again stated it "[did not] see substantial evidence of a claim of right in this case."

In response, Miller's counsel pointed to Ross's testimony that the "white person" (Miller) told Ross, "If you didn't take money from us, we will give you your stuff back."

Observing that "[i]t still sounds like [the defendants are] claiming they're agents," the court stated that a relationship between the defendants and Murphy had not been established and, even if an agency relationship between Murphy and the defendants were shown, "[y]ou can't have a claim of right as an agent."  In response, the prosecutor argued there was no evidence of agency and, even if there were such evidence, "the claim of right defense [did] not apply to offset or pay claims of an undetermined or disputed amount," and neither Murphy nor the defendants had a claim of right to Ross's wallet, car, or camera.  The prosecutor also stated that, even assuming agency applied, one cannot properly claim that "'[y]ou stole $28,000, so we're going to take your $500.'"

The court again indicated it was inclined not to give the claim-of-right defense instruction, but stated it would reserve ruling to allow the parties to research whether agency applies to a claim of right.

The court later requested additional argument regarding defendants' request for the claim-of-right defense instruction (CALCRIM No. 1863).  The court stated that, although the claim of right defense did not apply to the carjacking count, it was "leaning towards giving the instruction" with respect to the robbery and burglary counts.

11

Citing *People v. Tufunga* (1999) 21 Cal.4th 935 (*Tufunga*), the prosecutor responded that the claim-of-right defense did not apply to attempts to satisfy or collect a debt or to attempts to recovery property on behalf of a third party based on agency. The prosecutor stated "there [was] no evidence that [Ross] took money from [Miller] or [Gallardo]." The prosecutor also argued the claim-of-right defense applied only to specific property, and, where the theft was of money, the money had to be not only in the same amount, it had to be the exact same currency as to which a claim of right was asserted.

1. *Ruling*

The court agreed with the prosecution and denied defendants' request for a claim-of-right defense instruction. Citing *Tufunga*, *supra*, 21 Cal.4th 935, the court stated that, "when you have a claim of right to currency . . . , you can only recover the specific currency to which you have the claim of right. Otherwise, the claim of right is not a valid defense." The court found Ross's testimony was "the only testimony regarding the cash that was taken," Ross "was very specific that this cash came from his business," and he "denied taking any money from [Murphy]." Stating "if there is to be any claim-of-right defense, . . . it would only apply to the cash," the court found "[t]here was no statement by any defendant, either through [Ross] or in their interviews, that indicated they believed they were taking the same money . . . for which they had had a claim of right."

12

B. *Applicable Legal Principles*

1. *Duty to instruct*

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

The duty to instruct on general principles closely and openly connected with the facts before the court also encompasses an obligation to instruct on an affirmative defense, even in the absence of a request, "if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Sedeno* (1974) 10 Cal.3d 703, 716, disapproved on another ground in *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 & in *People v. Breverman* (1998) 19 Cal.4th 142, 164-165; see also *People v. Boyer* (2006) 38 Cal.4th 412, 468-469.)

"[T]he trial court need give a requested instruction concerning a defense only if there is substantial evidence to support the defense." (*People v. Miceli* (2002) 104 Cal.App.4th 256, 267.) Substantial evidence is evidence that is sufficient to deserve the jury's consideration; "'"that is, evidence that a reasonable jury could find persuasive."'" (*People v. Benavides* (2005) 35 Cal.4th 69, 102.) However, if the evidence supporting a purported defense is too "minimal and insubstantial" to merit consideration by the jury,

13

the trial court has no duty to instruct on the defense. (*People v. Flannel, supra,* 25 Cal.3d at p. 684 & fn. 12, superseded by statute on another point as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 777.)

  2. *Claim-of-right defense*

"An essential element of any theft crime is the specific intent to permanently deprive the owner of his or her property." (*People v. Williams* (2009) 176 Cal.App.4th 1521, 1526 (*Williams*), citing *People v. Avery* (2002) 27 Cal.4th 49, 54–55.) "'"Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule in this state and generally throughout the country that *a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent*. [Citations.] A belief that the property taken *belongs to the taker* [citations], . . . is sufficient to preclude felonious intent. Felonious intent exists only if *the actor* intends to take the property of another without believing in good faith that *he* has a right or claim to it."'" (*Tufunga, supra,* 21 Cal.4th at p. 943, quoting *People v. Barnett* (1998) 17 Cal.4th 1044, 1142–1143 (*Barnett*), italics added.)

In *Tufunga,* the California Supreme Court explained that "[t]he claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that *he* has a *right or claim to property* he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*Tufunga, supra,* 21 Cal.4th at p. 938, italics added.) Noting that "strong public policy considerations disfavor[] self-help through force or

14

violence, including the forcible recapture of property" (*ibid*.), the *Tufunga* court stated that the California Legislature "incorporated the common law claim-of-right doctrine into the statutorily defined mens rea element of robbery when it codified that offense over 100 years ago" (*id.* at p. 953), and "consequently, we are not free to judicially abolish it and thereby effectively expand the statutory definition of the crime." (*Ibid*.)

However, "[i]n this state, limitations have been imposed on the availability of the [claim-of-right] defense. For example, the defense is not permitted where the claimed right to the property is rooted in a 'notoriously illegal' transaction." (*Barnett*, *supra*, 17 Cal.4th at p. 1144.) Also, "[i]n furtherance of the public policy discouraging the use of forcible self-help" (*Tufunga, supra,* 21 Cal.4th at p. 950), the Supreme Court in *Tufunga* held that the claim-of-right defense does not extend to "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated─as opposed to forcible takings intended to recover *specific personal property* in which the defendant in good faith believes *he* has a *bona fide claim of ownership or title*." (*Id.* at p. 956, italics added; see also *People v. Fenderson* (2010) 188 Cal.App.4th 625, 644, fn. 10.)

"'[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that [the defendant] acted with a subjective belief *he or she* had a lawful claim on the property.'" (*Barnett*, *supra*, 17 Cal.4th at p. 1145, italics added, quoting *People v. Romo* (1990) 220 Cal.App.3d 514, 519, italics omitted.)

15

3. *Standard of review*

On appeal, we review de novo a claim of instructional error (*People v. Posey* (2004) 32 Cal.4th 193, 218), and we review the legal correctness of the court's ruling, not the court's reasoning (*People v. Zapien* (1993) 4 Cal.4th 929, 976).

C. *Analysis*

In support of their claim that the court prejudicially erred in denying their request for a jury instruction under CALCRIM No. 1863 on the claim-of-right defense, defendants contend that (1) substantial evidence "fully supported" their claim-of-right defense to the robbery and burglary charges, and (2) "[t]he argument that the [claim-of-right] defense does not apply to items taken by a third person or agent of the owner of the property . . . is unsupported by authority and makes no sense" in light of *Williams*, *supra*, 176 Cal.App.4th 1521 (discussed, *post*). These contentions are unavailing.

As already discussed, subject to certain recognized exceptions, the claim-of-right defense provides that a defendant's good faith belief—even if mistakenly held—that he or she has a bona fide claim of right in the actual ownership of, or title to, property that he or she takes from another person negates the felonious intent necessary for conviction of theft or robbery. (See *Tufunga*, *supra*, 21 Cal.4th at pp. 938, 943, 948-949, 950; CALCRIM No. 1863 (see fn. 2, *ante*).)

Here, the record is devoid of substantial evidence from which a jury could reasonably find either Miller or Gallardo had a good faith belief he had a bona fide claim of right in the actual ownership of, or title to, the property they took from Ross, the victim in this case. On appeal, defendants acknowledge the evidence "included the

16

statements made by [Miller] during the robbery that . . . he and Gallardo were at Ross's residence . . . because Ross had taken $28,000" from "someone."  Ross did testify at trial that, during the robbery, Miller "said he was there because I [(Ross)] took money" in the amount of $28,000 "from somebody."  Defendants also acknowledge the evidence shows that, during his police interview, Miller stated that "people steal from other people"; "somebody owed" money to a "dude" whom Miller did not name; "sometimes people fuckin['] want their money back;" he got Ross's name on a piece of paper from someone; and he (Miller) did it for money because he was "dead broke."  This evidence shows Miller did not claim during his police interview that Ross had taken money from him or Gallardo.

Defendants also acknowledge the evidence shows Ross "had been contacted several months earlier by a woman named Murphy, who owned property that he and his mother had looked at, and who accused them of stealing $28,000 during that visit."  Ross testified to these facts at trial.[4]

---

4    As noted, *ante*, Ross denied he or his mother took any money from Murphy's home.

Given the foregoing trial record and defendants' acknowledgments on appeal, we conclude there is no substantial evidence from which a jury could reasonably find that either Miller or Gallardo had a good faith belief he had a bona fide claim of right in the actual ownership of, or title to, the property they took from Ross.

In an effort to show they had a bona claim of right in the ownership of that property, defendants selectively point to Ross's testimony that Miller told him during the robbery, "[I]f [you] didn't take money from *us*, we will give you your stuff back." (Italics added.) However, as already noted, if the evidence supporting a purported defense is too minimal and insubstantial to merit consideration by the jury, the trial court has no duty to instruct on the defense. (*People v. Flannel*, *supra*, 25 Cal.3d at p. 684 & fn. 12.) Here, in light of the strong evidence establishing the claim of right to the property in question belonged to Ross or Murphy, not Miller or Gallardo, we conclude the evidence of the foregoing statement attributed to Miller was too minimal and insubstantial to merit consideration by the jury and, thus, was insufficient to warrant the giving of an instruction on the claim-of-right defense.

Defendants alternatively claim they were entitled to a claim-of-right defense instruction under CALCRIM No. 1863 because they only acted as agents of a third party. Specifically, citing *Williams*, *supra*, 176 Cal.App.4th 1521, they urge this court to hold that the claim-of-right defense extends to agents of a "putative" owner "just as it does to accomplices." Defendants claim that "the fact [they] did not have a personal claim of

18

right and instead acted as the agent of another"—Murphy—"does not justify the denial of the [claim-of-right defense] instruction."  We reject these claims.

In *Williams*, the defendant was charged with robbery and burglary with a target crime of larceny, and he was tried—and the jury was instructed—on the theory he aided and abetted his brother in stealing a car and a laptop computer from his brother's former girlfriend.  (*Williams*, *supra*, 176 Cal.App.4th at pp. 1524, 1527-1528.)  At trial, the prosecution presented evidence that the defendant, his brother, and another man entered an apartment where they found the former girlfriend.  The defendant pulled out a handgun when his brother directed him to do so, and the brother demanded that his former girlfriend give him the laptop and the keys to the car, both of which she had purchased.  The brother took her keys, and either the defendant, his brother, or their cohort drove away in the car, which contained the laptop.  (*Id*. at p. 1525.)  The defendant testified the car belonged to his brother and denied possessing a gun during the incident.  (*Ibid*.)

Concluding that the trial court committed harmless error by denying the defendant's request for a jury instruction under CALCRIM No. 1863 regarding the claim-of-right defense, the Court of Appeal in *Williams* affirmed the judgment, holding that "a good faith belief by a defendant, tried as an accomplice, that he was assisting his coprincipal retake the principal's property negates the 'felonious intent' element of both larceny and robbery, and that an instruction on the claim-of-right defense must be given where substantial evidence supports such a belief."  (*Williams*, *supra*, 176 Cal.App.4th at pp. 1528-1529.)  Noting that to be liable as a principal on an aiding and abetting theory

19

the accused must share the specific intent of the perpetrator, the *Williams* court explained that "[i]t would defy logic and common sense to hold that a defendant who absconds with goods by force under a good faith belief that he was repossessing his own property does not thereby commit robbery, but that his accomplice, who assists him in the same act and shares the same intent, may be found guilty. The latter, just as surely as the former, lacks the specific intent to deprive another of his or her property." (*Id*. at p. 1528.)

*Williams* provides a limited exception to the *Tufunga* rule that the claim-of-right defense applies to takings intended to recover specific personal property in which the defendant in good faith believes *he or she* has a bona fide claim of ownership or title to the property. Under the *Williams* exception, a defendant who is charged with larceny or robbery as an accomplice on an aiding-and-abetting theory that he or she assisted a coprincipal retake the coprincipal's property, is entitled to have the jury instructed on the claim-of-right defense when there is substantial evidence the defendant believed in good faith that the property taken belonged to the coprincipal. (*Williams*, *supra*, 176 Cal.App.4th at pp. 1524, 1528-1529.)

Miller and Gallardo's reliance on *Williams* is unavailing because that case has no application here, and—in light of the strong public policy against forcible self-help—it does not support the extension of the claim-of-right defense to defendants who claim to be agents of putative third-party owners of property the defendants are accused of stealing. Unlike the *Williams* defendant, Miller and Gallardo were not charged as accomplices on a theory they aided and abetted a coprincipal who had a claim of right to the property they took. Assuming for purposes of analysis that Murphy or some other

20

third party had a claim of right to the property defendants took from Ross, and that defendants acted as "agents" for that third party, any such claimant was not a coprincipal in this case for the simple reason that Miller and Gallardo acted alone without an accomplice. Unlike the *Williams* defendant─an accomplice whose alleged criminal liability derived from the acts of his coprincipal (his brother) whom he aided and abetted─Miller and Gallardo were tried and convicted not as aiders and abettors of a coprincipal claiming to be the owner of the property they took, but as the actual perpetrators of the burglary and robbery charged in this case. Thus, *Williams* is distinguishable and has no application here.

We also reject Miller and Gallardo's claim that *Williams* supports the extension of the claim-of-right defense to defendants who claim to be agents of an "absent" third-party who allegedly claims ownership of, or title to, property they are accused of stealing, and who is not charged as a principal. In support of this claim, defendants assert "[t]here is simply no qualitative difference between the *intent* of a person who aids and abets the owner of property that is present at and participates in the robbery, and a person who assists an absent owner in recovering that property."

We are guided in our analysis by the California Supreme Court's holding and reasoning in *Tufunga, supra*, 21 Cal.4th 935. In holding that the claim-of-right defense does not extend to "robberies perpetrated to satisfy, settle or otherwise collect on a debt, liquidated or unliquidated" (*id.* at p. 956), the *Tufunga* court reaffirmed that the claim-of-right defense defense applies to "forcible takings intended to recover specific personal property in which the defendant in good faith believes he has a bona fide claim of

21

ownership or title." (*Ibid*.)  However, in refusing to expand the scope of the claim-of-right defense, the Supreme Court reasoned in part that an extension of that defense to a defendant's forcible taking of property other than specific personal property in which the defendant in good faith believes he or she personally has a bona fide claim of ownership or title would be contrary to the "sound" public policy of discouraging the use of forcible self-help.  (*Ibid*.)  Observing that "[t]he legitimacy of the need for our laws to discourage forcible or violent self-help as a remedy seems beyond question" (*id*. at p. 953), the *Tufunga* court explained the importance of this public policy in circumscribing the availability of the claim-of-right defense:

> """It is a general principle that one who is or believes he is injured or deprived of what he is lawfully entitled to must apply to the state for help.  Self-help is in conflict with the very idea of social order.  It subjects the weaker to risk of the arbitrary will or mistaken belief of the stronger.  Hence the law in general forbids it."""  (*Id.* at pp. 952-953, quoting *Daluiso v. Boone* (1969) 71 Cal.2d 484, 500.)

The same strong public policy of discouraging forcible or violent self-help on which the *Tufunga* court relied in refusing to extend the claim-of-right defense in that case also precludes extension of that defense to defendants who have no right or claim of ownership to property they are accused of stealing or attempting to steal, and who only claim to be agents of a third party who allegedly has such a claim but was not a coprincipal in the commission of the charged offenses.

As the record conclusively shows neither Miller nor Gallardo had a bona fide claim of ownership or title to the property they took from Ross, and in committing the charged offenses they did not act in concert with a coprincipal who had such a claim, we

22

conclude defendants were not entitled to a jury instruction under CALCRIM No. 1863 regarding the claim-of-right defense. Accordingly, we also conclude the court did not err in refusing to give that instruction.

## II. *GALLARDO'S CLAIM OF EVIDENTIARY ERROR*

Gallardo separately contends his robbery and burglary convictions must be reversed because the court abused its discretion under Evidence Code sections 352 and 1101 and violated his right to federal due process by admitting irrelevent and prejudicial evidence that he was in possession of a shotgun when he was found in a treehouse and arrested after the robbery incident. We reject this contention.

### A. *Background*

Outside the presence of the jury and prior to the presentation of evidence at trial, the court indicated Gallardo was contemplating pleading guilty to the charges involving possession of a firearm (a shotgun), ammunition, drugs (methamphetamine), and drug paraphernalia (counts 5-8). The court explained for the record its understanding of the prosecutor's argument that, even if Gallardo pleaded guilty to these charges, evidence of his possession of the shotgun in a treehouse at the time of his arrest—the basis for count 5—should be admitted because it was relevant to his state of mind in attempting to conceal himself from the police when they were searching for him during their execution of a search warrant.

Gallardo's counsel argued the evidence concerning the shotgun should be excluded because there was no connection between it and the charged robbery, the prosecution did

23

not allege Gallardo brandished the weapon, and under Evidence Code section 352 the prejudicial effect of the evidence substantially outweighed its probative value.

The court reserved ruling until later, but indicated it seemed the fact Gallardo was armed when he went into the treehouse to avoid detection by the police might tend to show consciousness of guilt. In response, Gallardo's counsel acknowledged that Gallardo's hiding in the treehouse after he heard the police searching for him might indicate consciousness of guilt. Counsel asserted, however, that the prosecutor was already getting evidence on consciousness of guilt based on Gallardo's attempt to flee by going up into the treehouse. Counsel argued that the lack of evidence showing Gallardo took the shotgun into the treehouse with him should be part of the court's Evidence Code section 352 analysis as it diminished the probative value of the evidence relative to its prejudicial effect.

The court noted that the evidence was "definitely prejudicial," The court stated that an ordinary citizen would be "significantly concern[ed]" by the evidence that Gallardo was in a treehouse with a shotgun when the police arrived, and prejudice might be an issue if Gallardo's "link" to those offenses was "very, very weak."

Shortly thereafter, Gallardo's counsel indicated to the court that for strategic reasons Gallardo would be pleading to the charge of possession of a firearm by a prohibited person (former § 12021.1, subd. (a)) because an element of the offense was a conviction of a prior violent felony, and counsel did not want the jury to learn of Gallardo's prior conviction in deciding the current charges.

Later that day, the court revisited the issue. The prosecutor submitted on his previous arguments that Gallardo's possession of the shotgun was relevant to the issue of his state of mind in attempting to flee. Gallardo's counsel again asserted the evidence should be excluded under Evidence Code section 352, stating he had "pretty much said what [he thought] in terms of consciousness of guilt of having done a home-invasion robbery months prior, having the gun up there without evidence that he brought it up there with him or brought it because of the cops or something. I think its . . . probative value is substantially outweighed by its prejudicial effect."

The court ruled it would permit the prosecutor to introduce evidence concerning the location of the shotgun in the treehouse. Gallardo subsequently pleaded guilty, outside the presence of the jury, to unlawful possession of a firearm by a person previously convicted of a qualifying felony, as charged in count 5, as well as to the offenses charged in counts 6 through 8 (discussed, *ante*).

During the trial, the prosecution presented evidence that a shotgun was found in the treehouse where Gallardo was hiding when the SWAT team arrived to arrest him. The prosecution also introduced two photographs of the shotgun recovered from the treehouse.

During his closing arguments, the prosecutor repeatedly referred to the evidence showing the police found Gallardo hiding in a treehouse with a shotgun, arguing the evidence established Gallardo was guilty of the charged crimes. For example, the prosecutor argued, "Do innocent people go up and hide in the treehouse with a . . . shotgun when the police show up to their property?" Shortly thereafter, the

25

prosecutor argued that Gallardo "didn't come in and say, 'Why the heck is there a SWAT team on my property?' Didn't come down and say, 'What's going on here? How can I help you, sir? What's wrong here? Why are you doing this?' I'm an innocent man.' [¶] No. A shotgun and a treehouse equals admission of guilt." During rebuttal the prosecutor asked the jury, "Why hide up in a treehouse with a shotgun unless you're guilty?"

B. *Applicable Legal Principles*

1. *Evidence Code sections 350 and 210*

Evidence Code section 350 provides that only relevant evidence is admissible. Evidence Code section 210 defines relevant evidence as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

2. *Evidence Code section 1101*

Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Thus, evidence of other crimes or bad acts is inadmissible when it is offered to show that a defendant had the criminal disposition or propensity to commit the crime charged. (Evid. Code, § 1101, subd. (a).)

Evidence Code section 1101, subdivision (b) "clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is

26

relevant to establish some fact other than the person's character or disposition." (*Ewoldt, supra*, 7 Cal.4th at p. 393, fn. omitted.) Specifically, that subdivision provides that nothing in Evidence Code section 1101 "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

  3. *Evidence Code section 352*

  If the trial court determines that uncharged misconduct is admissible under Evidence Code section 1101, subdivision (b), it must then determine under Evidence Code section 352 whether the probative value of the evidence is " 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Ewoldt, supra*, 7 Cal.4th at p. 404; Evid. Code, § 352.)

  The California Supreme Court has explained that "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which *uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on*

27

*the issues*. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)

4. *Due process*

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439, italics omitted.)

5. *Standard of review*

"[A] trial court has broad discretion in determining the relevance of evidence" (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167), and we will not reverse the court's ruling unless there is a clear abuse of discretion (*People v. Waidla* (2000) 22 Cal.4th 690, 717-718). We also review the trial court's rulings under Evidence Code sections 1101 and 352 for an abuse of discretion. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

Under the abuse-of-discretion standard of review, a trial court's exercise of discretion in admitting or excluding evidence will not be disturbed, and reversal of the judgment is not required, "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

C. *Analysis*

We reject Gallardo's claim of evidentiary error, and conclude reversal of his robbery and burglary convictions is not required because (1) the court did not abuse its discretion in admitting the challenged evidence showing Gallardo was in possession of a

shotgun when he was found hiding in a treehouse and arrested after the robbery incident, and (2) the admission of this evidence did not render his trial fundamentally unfair.

First, we reject Gallardo's contention that the court abused its discretion in admitting the challenged evidence because it was not relevant. We conclude the evidence was relevant because it had some "tendency in reason to prove or disprove [a] disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210) as it tended in some degree to show consciousness of guilt. In *People v. Hall* (1926) 199 Cal. 451, 460 (*Hall*), the California Supreme Court long ago explained that "[i]t is elementary that the flight of a person after the commission of a crime, while not of itself sufficient to establish guilt or to raise a presumption of guilt, is a circumstance to be considered by the jury in connection with all the other facts and circumstances in the case as tending in some degree to prove the *consciousness of guilt*, and evidence thereof is admissible . . . as indicative of a guilty mind." (Italics added.) The Supreme Court also explained that "[i]t is permissible, in proof of the fact of flight, to show *all of the facts and circumstances attending the flight* either to increase or decrease, as the case may be, the probative force of the fact of flight. In other words, when testimony as to flight is resorted to, it is proper to show the extent of the flight and the circumstances thereof, including the acts and doings of the defendant, which tend to characterize and increase its significance." (*Ibid*.) In *Hall*, the Supreme Court held the trial court properly admitted evidence showing the defendant possessed a sawed-off rifle and a box of cartridges as circumstances attending the defendant's alleged flight. (*Ibid*., italics added.) Specifically, the *Hall* court held "[i]t was . . . proper for the prosecution to show, as bearing upon this question, that the

29

defendant had ammunition and firearms in his possession which were adapted to further his flight and thereby accentuate the fact of flight. For this purpose the articles in question were admissible in evidence." (*Ibid.*)

Similarly here, evidence showing Gallardo possessed a shotgun while hiding in a treehouse as the police were searching for him was relevant as a circumstance attending his alleged flight because it tended both to increase the probative force of such flight and to show consciousness of guilt. (See *Hall*, *supra*, 199 Cal. at p. 460.)

Gallardo acknowledges that "[t]he fact [he] retreated to the treehouse when the SWAT team arrived to arrest him was arguably relevant to the issue of his consciousness of guilt for the charged offenses." He also acknowledges "the presence of the shotgun in the treehouse was a circumstance surrounding his arrest." He claims, however, that "[h]is consciousness of guilt . . . was adequately shown by evidence that he was found hiding in a treehouse after 42 members of the SWAT team had been searching his property for 30 minutes." However, as we have already concluded, the evidence of Gallardo's possession of the shotgun in the treehouse was relevant as a circumstance attending his alleged flight.

Citing *People v. Henderson* (1976) 58 Cal.App.3d 349, 360, Gallardo also asserts the presence of the shotgun "was not relevant to his consciousness of guilt as he did not use it in an effort to avoid apprehension." Specifically, he asserts the evidence is not relevant because "[he] did not threaten the officers with the gun or brandish it." Gallardo cites no authority, and we are aware of none, to support the proposition that evidence of a defendant's possession of a weapon as a circumstance attending his alleged flight is not

30

relevant to show consciousness of guilt unless the evidence also shows the defendant "threaten[ed] the officers with the gun or brandish[ed] it" during such flight. Gallardo's reliance on *Henderson* is unavailing as that case did not involve admission of evidence the defendant possessed a gun as a circumstance attending an alleged flight and showing consciousness of guilt.

Second, we reject Gallardo's contention that the court abused its discretion in admitting the challenged evidence because "the evidence concerning the shotgun was inadmissible under [Evidence Code] section 1101 [as] it amounted merely to evidence of [his] character or propensity for possessing deadly weapons." As already discussed, nothing in Evidence Code section 1101 "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact . . . other than his . . . disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) Here, the challenged evidence was relevant to prove some fact other than Gallardo's "character or propensity for possessing deadly weapons." We have already concluded the evidence was relevant because it was evidence of an attendant circumstance of Gallardo's alleged flight that tended to show consciousness of guilt. (See *Hall*, *supra*, 199 Cal. at p. 460.)

Third, we reject Gallardo's contention that the court abused its discretion under Evidence Code section 352 in admitting the challenged evidence because "[t]he shotgun evidence had little, if any probative value given the other evidence the prosecution had to show consciousness of guilt," and it was "more prejudicial than probative" because it tended to invoke an emotional bias against him with little effect on the issues. The evidence was probative of Gallardo's state of mind because it tended to show

31

consciousness of guilt during an attempt to hide from police officers searching for him, and it was not unduly prejudicial because the jury heard properly admitted testimony that Miller placed a semiautomatic handgun to Ross's head after he and Gallardo rushed him and threw him to the ground.

Last, we conclude the admission of the challenged evidence did not render Gallardo's trial fundamentally unfair as the evidence of his guilt (discussed, *ante*, in the factual background) was very strong. Gallardo's reliance on *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378 is unavailing. In *McKinney*, the court held that evidence of the defendant's possession of a knife that could not have been used to commit the murder charged in that case was prejudicial because it only served "to prey on the emotions of the jury" (*id.* at p. 1385) in a solely circumstantial evidence case. Gallardo's reliance on *McKinney* is unavailing because Ninth Circuit authority is not binding on this court (see *People v. Bradford* (1997) 15 Cal.4th 1229, 1292), and *McKinney* is factually distinguishable because it did not involve admission of relevant evidence of a defendant's flight or consciousness of guilt.

For all of the foregoing reasons, we conclude the court did not abuse its discretion in admitting the challenged evidence, and the admission of the evidence did not render Gallardo's trial fundamentally unfair.

DISPOSITION

The judgments are affirmed.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.

33