Filed 9/29/16  P. v. Lemmon CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C074689 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F7820) |
| v. | |
| KEVIN FRANK LEMMON et al., | |
| Defendants and Appellants. | |

A jury convicted defendants Kevin Frank Lemmon and William Lee Freed, Jr., of first degree murder, first degree robbery, and first degree burglary and found true the special allegations of robbery in concert.  As to defendant Freed, the jury also found true the special allegations that he used a deadly weapon.  Because the jury also found true the allegations that both defendants committed murder while they were engaged in the commission of robbery and burglary, the trial court sentenced them to life without the

1

possibility of parole. (Pen. Code, § 190.2, subd. (a)(17)(A) & (G).)[1] The trial court sentenced Lemmon to a consecutive determinate term of nine years for the robbery in concert and prior prison term enhancements pursuant to section 667.5, subdivision (b). The court sentenced Freed to a consecutive determinate term of 13 years for the robbery in concert and enhancements for use of a deadly weapon and for a prior serious and/or violent felony.

The evidence showed that the murder occurred when defendants forced their way into the motel room of the victim, Steven Johnson, in order to steal money and/or drugs and to retrieve some personal belongings of Lemmon's girlfriend, Amanda Welcher. When Johnson tried to fight off the intrusion, Freed stabbed him multiple times. Much of the evidence at trial was given by Kenneth Matthews, who drove to the motel with defendants, was present outside the motel room during the fight, and drove away with defendants. Matthews was originally charged as a defendant, but entered into a plea agreement in exchange for his testimony.

Defendants challenge the sufficiency of the evidence against them, given the fact that much of the crucial evidence against them came from the testimony of Matthews, an accomplice. We shall conclude that there was sufficient independent evidence to reasonably connect defendants to the commission of the crimes, and it was not necessary that independent evidence corroborate every element of the crimes.

Defendants also challenge the jury instructions as they relate to their intent. They claim the trial court should have given a mistake of fact instruction because they believed they were retrieving Welcher's property, not stealing Johnson's property. We shall explain that even if they had taken Welcher's property from Johnson forcibly, their actions would not have been innocent, thus no mistake of fact instruction was

---

**1** Further statutory references to sections of an undesignated code are to the Penal Code.

appropriate. Defendants also claim the court should have instructed the jury they would be guilty only of voluntary manslaughter if the jury found they acted with an actual but unreasonable belief in the need to defend themselves. We shall explain that defendants could not invoke the imperfect self-defense doctrine because they created circumstances under which Johnson's attack was legally justified.

Defendants also argue the trial court should have expanded the claim of right defense instruction it gave to apply to an aider and abettor. We shall explain that no claim of right defense instruction should have been given because the property they claim they were "retrieving" was not their own. Defendants argue their trial counsel should have requested an instruction that provocation could reduce the murder from first degree to second degree. We shall explain that any such instruction would not have resulted in a different outcome, since the jury found the murder occurred during the commission of a robbery and burglary, making the murder one of first degree.

We agree with Lemmon that his consecutive sentence for first degree robbery should have been stayed pursuant to section 654, because there was no evidence that he was motivated by any design other than to rob and burglarize Johnson. We will stay Lemmon's robbery sentence with enhancements, but shall otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In December 2011, defendant Lemmon and his girlfriend Amanda Welcher were living in the home of Charles Deckard and Camelle Lowrey on Orion Way. Defendant Freed's brother, Bobby, also lived in the Orion Way house. Defendant Freed was not living at the Orion Way house, but had stayed there for a couple of nights before the incident. Kevin Matthews, who accepted a plea agreement in exchange for his testimony, was a friend of Lemmon's.[2]

---

[2] Matthews pleaded guilty to involuntary manslaughter and robbery with a potential sentence of 6 to 13 years in exchange for his testimony.

Matthews went to the Orion Way house with Lemmon and Welcher because Matthews wanted methamphetamine. At the house, Matthews got methamphetamine from Lemmon. On the way there, they stopped for gas where Welcher got a phone call. Following the call she said something to Lemmon, whereupon Lemmon asked Matthews to go with him to retrieve some of Welcher's belongings from the victim, Steven Johnson. Matthews, Lemmon, and Freed left in Lemmon's truck. Lemmon said if Johnson did not hand over Amanda's belongings, they would "kick his ass."

Lemmon drove Matthews and Freed to the Hilltop Lodge. They parked at a nearby restaurant parking lot, where they saw three teenage boys outside of room 117. They thought the boys might be with the victim in room 117. Lemmon and Freed got out of the truck, while Matthews drove the truck around the parking lot. After a few minutes, Matthews parked and got out of the truck, and Lemmon and Freed returned to the truck.

Lemmon asked to use Matthews's cell phone to call Amanda Welcher. Lemmon asked Welcher for confirmation that they had the right room. After the phone call ended, Lemmon said that the victim had $1,900 and a bag of methamphetamine. Lemmon said they would get Amanda's things and if there was anything else, they would take it. They got back in the truck, and parked at another nearby parking lot.

Lemmon had a can of pepper spray, and he handed Matthews a crowbar, which Matthews refused. Matthews did not see anything in Freed's possession. Freed's plan was to knock on the victim's door and ask for a glass of water. Matthews was supposed to stand outside and keep watch.

Freed and Lemmon did not go directly to room 117 because Lemmon was concerned about the three boys. Eventually Freed knocked on the door. When Johnson answered, Freed asked for a glass of water and said, "do you remember me?" Johnson said he did not, then Freed "cracked the guy in the face and entered the room." Lemmon ran into the room. Matthews could hear fighting and things being tossed in the room. People began to look out their doors and windows. One couple asked what was going on.

4

Matthews told them a young girl was in trouble. Matthews went to the room, and saw through the partially open door that Lemmon was swinging his right arm back. He saw a backpack in Lemmon's right hand. Matthews closed the door and went back to the truck.

Matthews, Lemmon, and Freed all got to the truck at about the same time. Lemmon was carrying two backpacks. Freed was rubbing his face and breathing heavily. He complained about his vision and breathing. Freed was yelling and complaining during the trip back to the Orion Way house about being sprayed in the face. They were all three having a hard time breathing because of the smell of pepper spray in the vehicle.

Lemmon complained that Freed had gone overboard. Freed said, "What was I supposed to do? He was fighting back." Lemmon said, "[W]e were only supposed to rough the guy up." Freed had a folding knife in his hand, held it up, and asked Lemmon what he should do with it. Lemmon responded, "Fuck you; that's on you." Lemmon told Freed to get rid of the knife, so Freed tossed the knife out the window. Lemmon asked Freed what he had taken out of the victim's pocket. Freed answered "this," and threw a couple of wadded bills on the dash.

Matthews later showed police where Freed had thrown the knife. The knife was found during a police search of the area Matthews indicated. The knife had dried blood on the blade. DNA testing of the dried blood on the knife blade matched the victim's DNA. There was also DNA on the knife handle. The profile of the primary contributor of the DNA on the handle matched Freed's DNA.

When Lemmon, Freed, and Matthews got to the Orion Way house, Freed and Lemmon immediately went to the bathroom to wash their faces. They pulled the truck they had driven into the garage. Freed said he might have hurt some guy. He mentioned using a knife and stabbing someone. He said, "I think he's dead" and "I think I stabbed him eight deep and he's dead." Freed owned a silver folding knife.

Lemmon was upset with Welcher because the backpacks did not belong to her. Both backpacks contained boxer shorts, socks, and men's toiletries. One backpack

5

contained pornographic DVD's and Amanda was upset about these because "[t]hey were 18 and under." There were papers in the backpacks, which Matthews burned in the barbeque pit.

Sergeant Todd Cogle of the Redding Police Department responded to the murder scene after receiving a call regarding a disturbance in room 117 at the Hilltop Lodge. He arrived around 9:00 p.m. Upon arriving at room 117, he found the night manager of the motel, Pamela Kunkler, with a male subject, Johnson, who was on the ground and bleeding. Kunkler had received a call from the 911 operator that a man was hurt, so Kunkler went to check it out.

Medical personnel arrived shortly after Cogle, and Cogle could see when they lifted the victim's shirt that he had several stab wounds on his chest. The victim was identified as Steven Johnny Johnson. Cogle also noticed that the room smelled like pepper spray. It made Cogle's eyes water, and made him cough. He also noticed the medical staff coughing. Cogle found a black can that looked like a mace can lying on the floor about four to five feet from the body. Subsequent testing of DNA from the spray can matched Lemmon's DNA profile. DNA testing excluded Johnson, Matthews, and Freed as contributors to the DNA on the spray can.

Jeff Woodard was living at the Hilltop Lodge on December 14, 2011. He remembered seeing two or three people walking by his room. Will Williams, a police investigator, interviewed Woodard following the incident. Woodard told Williams that there had been a commotion, and that one person had gone to see what was going on. When that person walked by Woodard, he told Woodard there was no problem, that they were there helping a 14-year-old girl who had been in a room with a man. Woodard also told Williams that one of the three men, a heavyset rough-looking man with an olive complexion, had been rubbing his eyes. Freed was around five feet six inches tall and weighed 350 pounds.

6

Ismael Porras was a friend of defendant Freed. He testified he did not know defendant Lemmon before he came to jail. Porras had been homeless in December 2011. Between 12:00 a.m. and 4:00 a.m. on December 15, police officers observed a person carrying several bags get into a car at the Orion Way house. The car was registered to Porras. Porras later admitted leaving the house with two backpacks he got from Freed. He said the backpacks contained toiletry items.

Johnson suffered five stab wounds: three to the chest, one on the neck, and one to the upper abdomen. The cause of death was multiple stab wounds leading to blood loss.

After the jury found Freed guilty on all counts, the trial court sentenced him to life without parole, plus thirteen years. After the jury found Lemmon guilty on all counts, the trial court sentenced him to life without parole, plus nine years.

DISCUSSION

I

Arguments Raised by Lemmon

A. There is Sufficient Evidence to Support a Finding of First Degree Murder

In finding a defendant guilty of a crime, the jury cannot rely solely on the testimony of an accomplice. An accomplice's testimony must be corroborated by other evidence that tends to connect the defendant with the commission of the offense. (§ 1111.) The jury was instructed that defendants could be found guilty of first degree murder based on either of two theories: malice aforethought, or felony murder based on robbery, attempted robbery, and/or burglary. The only evidence that the defendants intended to rob Johnson via a planned surprise attack came through Matthews's testimony. Lemmon argues there is insufficient evidence of first degree murder because absent Matthews's uncorroborated testimony, there is no evidence of Lemmon's mental state, i.e., no evidence Lemmon intended to kill or intended to steal from anyone, and no evidence of malice or lying in wait.

7

We first consider the argument as to felony murder. The mental state the prosecution is required to prove for a conviction of first degree murder is that the defendant had the specific intent to kill, and acted with premeditation and deliberation. (*Alcala v. Superior* Court (2008) 43 Cal.4th 1205, 1223.) However, under the felony-murder rule, the ordinary mental-state elements of first degree murder are eliminated, and the only criminal intent required to be proved is the specific intent to commit the particular underlying felony. (*People v. Chavez* (2004) 118 Cal.App.4th 379, 385.) This means that for the jury to properly convict under a felony-murder theory, the only criminal intent the prosecution was required to prove was that defendant had the specific intent to commit robbery, attempted robbery, or burglary. Lemmon argues the only evidence of an intent to commit one of these crimes came solely from the testimony of accomplice Matthews. He argues that other than Matthews's testimony, the evidence was that his intent in going to the Hilltop Lodge and in using the pepper spray in the victim's motel room was solely to retrieve his girlfriend's property.

Lemmon misconstrues the corroboration requirement. It is not necessary that there be independent corroborative evidence sufficient to establish every element of the offense. (*People v. Luker* (1965) 63 Cal.2d 464, 469.) Nor is it necessary there be independent corroborative evidence sufficient to establish every fact to which the accomplice testifies. (*Ibid.*) Instead, there need only be independent evidence that tends to connect the defendant with the commission of the offense, so as to reasonably satisfy a jury that the accomplice is telling the truth. (*Ibid.*) " ' "Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant." [Citation.] "[The] corroborative evidence may be slight and entitled to little consideration when standing alone." [Citation.]' [Citation.] Finally, '[unless] a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably tend to connect a defendant with the commission of a crime, the finding of the trier of fact on

8

the issue of corroboration may not be disturbed on appeal.' " (*People v. Szeto* (1981) 29 Cal.3d 20, 27.)

Here, there was sufficient evidence connecting Lemmon to the crime. He was observed leaving the Orion Way house with Freed and Matthews, saying he was going to pick up his girlfriend's clothes from her ex. Lemmon was seen by two witnesses at the Hilltop Lodge on the night of the murder, and was seen going into one of the downstairs rooms. He came back to the Orion Way house with Freed, who admitted to stabbing and possibly killing someone. His DNA was found on a pepper spray can in the victim's motel room, along with the victim's body. Additionally, " 'Flight tends to connect an accused with the commission of an offense and may indicate that an accomplice's testimony is truthful.' [Citation.]" (*People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1378.) There was evidence Lemmon was discovered by a police dog hiding inside an old big-screen television cabinet. This was sufficient to reasonably tend to connect Lemmon with the commission of the crime.

For the same reason, it was not necessary to have independent evidence of lying in wait or malice. All that was needed was corroborating evidence that tended to connect Lemmon to the commission of the crime. Because there was evidence connecting Lemmon to the commission of the crime, it was not necessary to have independent corroboration of Lemmon's intent either under a felony-murder or premeditation/lying-in-wait theory.

Lemmon also makes the argument that there was no evidence, other than Matthews's testimony, of a robbery or burglary because there was no evidence anything was stolen. This is untrue. There was evidence that Johnson had his driver's license when he checked in at the motel. However, none of Johnson's belongings were found in the motel room, and his driver's license was eventually found in the trash at an RV park. The jury could have reasonably inferred, apart from Matthew's testimony, that Johnson would have had some personal belongings with him in the motel room, and that those

9

personal belongings included the backpacks containing men's toiletries given to Porras by Freed.

B. There Was Sufficient Evidence to Support the Special Circumstance Finding

Lemmon was sentenced to life without the possibility of parole because the jury found true the special allegations that Johnson's murder occurred during the commission of robbery and burglary. Lemmon argues that the prosecution was required to prove the corpus delicti of the robbery and burglary, and that it could not do so with the uncorroborated testimony of Matthews. As shown above, there was sufficient corroborating evidence of robbery and burglary because there was evidence connecting Lemmon to the crimes.

Even if there were not any corroborating evidence of the robbery and burglary, we would not reverse. The corpus delicti rule states that the prosecution must prove the fact of injury and the existence of a criminal agency as its cause, and cannot rely exclusively on the extrajudicial statements of the defendant. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169.) The rule also applies to the extrajudicial statements of a codefendant. (*Jones v. Superior Court* (1979) 96 Cal.App.3d 390, 396-397.) However, the rule is applicable only to *extrajudicial* statements. Here, there was in-court testimony from Matthews, thus the corpus delicti rule was satisfied.

C. Penal Code Section 654

Lemmon argues the trial court erred when it imposed a consecutive term for the first degree robbery offense, because the sentence for robbery should have been stayed pursuant to Penal Code section 654 and double jeopardy principles. He argues the record reflects a "reasonable probability" that the jury relied on a felony-murder theory to convict him of first degree murder, with the robbery/burglary being the underlying felony. He opines that the same robbery/burglary act constituted the special circumstance that resulted in his life without parole sentence. (§ 190.2, subd. (a) (17).)

10

Section 654, subdivision (a), provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." When a defendant is convicted of murder solely on a felony-murder theory, section 654 precludes imposition of a separate term for the predicate felony. (*People v. Montes* (2014) 58 Cal.4th 809, 898.)

However, where, as here, it is unknown whether the defendant was found guilty of first degree murder on a theory of felony murder or premeditation and deliberation, and the trial court sentenced the defendant on the underlying felony, the trial court implicitly found that the defendant acted with more than one objective, a factual determination that must be sustained on appeal if supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.) In this case there was not substantial evidence that Lemmon acted with more than one objective.

The evidence of Lemmon's robbery objective included: (1) Matthews's testimony that Lemmon told him that if Johnson did not hand over Welcher's belongings, they would "kick his ass," (2) Matthews's testimony that they believed Johnson had $1,900 and a bag of methamphetamine in his room and that they planned to take it, (3) Matthews's testimony that the trio went to Johnson's room armed with a knife (Freed) and pepper spray (Lemmon), and that Lemmon tried to give Matthews a crowbar, (4) Matthews's testimony that Lemmon took the backpacks from the motel room, (5) and Matthews's testimony that Lemmon asked Freed what he took from Johnson's pockets.

The People argue the evidence that showed Lemmon had the separate intent and objective to commit murder was that Lemmon discharged the pepper spray, saw Freed stab Johnson, grabbed the backpacks, drove Freed away from the scene, and later helped Freed remove the pepper spray from his face. However, none of this shows anything more than the intent to rob Johnson, and to escape from the scene of the robbery. Even

11

though Lemmon discharged the pepper spray, there was no evidence that Johnson, as opposed to Freed was the target of the pepper spray. In fact, one of the responding officers testified he saw no visible signs of pepper spray, which stains the body, on Johnson. Furthermore, the evidence showed Lemmon was angry with Freed, who he said "went overboard."

Thus, there was no evidence that Lemmon was motivated by any design other than the robbery and burglary of Johnson. We will therefore stay Lemmon's sentence for robbery pursuant to section 654, as well as the enhancements to the robbery count. (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1221 ["When the base term of a sentence is stayed under section 654, the attendant enhancements must also be stayed."].) [3]

D. All of the Elements Are Deemed Admitted

Relying on *People v. Epperson* (1985) 168 Cal.App.3d 856 (*Epperson*), Lemmon argues the prior prison term enhancements imposed on the robbery count pursuant to section 667.5, subdivision (b) were not supported by substantial evidence. We briefly address the issue in the unlikely event Lemmon's conviction for first degree murder with special circumstances is overturned.

Section 667.5, subdivision (b) authorizes the trial court to impose a consecutive one-year term for each prior prison term if the defendant did not remain free of a felony conviction for five years. "Imposition of a sentence enhancement under Penal Code section 667.5 requires proof that the defendant: (1) was previously convicted of a felony; (2) was imprisoned as a result of that conviction; (3) completed that term of imprisonment; and (4) did not remain free for five years of both prison custody and the

---

[3]   Because we are staying the sentence on the robbery count, with enhancements, we need not consider Lemmon's argument that if the term for robbery is not stayed the sentence should be vacated because the trial court failed to state reasons for this sentencing choice and was not aware of its discretion to impose a concurrent term.

commission of a new offense resulting in a felony conviction." (*People v. Tenner* (1993) 6 Cal.4th 559, 563.)

Lemmon admitted the section 667.5, subdivision (b) allegations. In *Epperson, supra*, 168 Cal.App.3d 856, relied upon by Lemmon, the court struck the enhancements because it determined that the defendant's admissions of the prior convictions did not also admit the requisite prison term and the nonexistence of the five-year " 'washout' " period. (*Id.* at p. 865.) *Epperson* is distinguishable because the prosecution conceded that Epperson did remain free of prison custody and the commission of a felony for more than five years. (*Id.* at p. 863.)

We rely instead on *People v. Carrasco* (2012) 209 Cal.App.4th 715, 724, abrogated on another ground as noted in *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1518, which held that the totality of the circumstances rendered the defendant's admission sufficient to encompass both the facts of the convictions and the elements of the enhancements. Here, the trial court told Lemmon that by admitting the prior felony convictions he would be giving up his right to have a jury determine whether he had suffered the prior allegations, and explained that those allegations included his convictions, his state prison sentences, and his failure to remain free of crime for five years. Unlike *Epperson*, it is obvious on the face of the allegations that defendant did not remain free from prison custody or of the commission of a felony for more than five years.

We conclude that on the totality of the circumstances, Lemmon's admission sufficiently admitted every element of the enhancements.

E. Amendment of Abstract to Correct Clerical Error

Lemmon argues the abstract of judgment should be amended to correct the abstract's reflection that he was sentenced under the "two strikes" law. (§§ 667, subds. (b)-(i) or 1170.12.) The People concede the clerical error and do not oppose the amendment. We will order the correction on both Lemmon's and Freed's abstracts.

13

## II
## Arguments Raised by Freed

A. Claim of Right Defense Instruction

The trial court gave the following claim of right defense instruction pursuant to CALCRIM No. 1863: "If the defendant obtained property under a claim of right, he did not have the intent required for the crime of theft or robbery. The defendant obtained property under a claim of right if he believed in good faith that he had a right to the specific property or a specific amount of money and he openly took it. In deciding whether the defendant believed he had a right to the property and whether he held that belief in good faith, consider all the facts known to him at the time he obtained the property along with all of the other evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable, but if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith. [¶] The claim-of-right defense does not apply if the defendant attempted to conceal the taking at the time it occurred or after the taking was discovered."

Freed requested the instruction be modified to apply to one who aids and abets a person acting under a claim of right. After some discussion, the trial court decided not to modify the instruction, opining that there arguably was not sufficient evidence to give the unmodified instruction, but that there was no substantial evidence to give the instruction for an aider and abettor.

Freed now argues that the trial court erred when it failed to give the modification that would have applied the claim-of-right instruction to an aider and abettor because there was substantial evidence to support Freed's belief that he was assisting Lemmon in retrieving Welcher's property.

The intent to permanently deprive the owner of his or her property is an essential element of any theft offense. (*People v. Williams* (2009) 176 Cal.App.4th 1521, 1526.)

14

The claim-of-right defense provides that if a defendant has the good faith belief that the property taken actually belongs to the defendant, this belief, even if erroneous, negates the intent necessary for a theft conviction. (*People v. Hussain* (2014) 231 Cal.App.4th 261, 269.)

The trial court did not err in failing to give the modified instruction. In fact, the trial court should not have given the claim-of-right instruction at all because neither Freed nor Lemmon were retrieving property they believed to be their own. The claim-of-right defense is limited to the perpetrator who seeks to recover what he believes in good faith to be his own personal property. (*People v. Anderson* (2015) 235 Cal.App.4th 93, 100.) The only exception we have recognized to this rule is for one who aids and abets the person retrieving his or her *own* property. (See *People v. Williams, supra,* 176 Cal.App.4th 1521.) That was not the case here.

### III
### Arguments Raised by Both Defendants

A. The Trial Court Was Not Required to Give a Mistake of Fact Instruction

Both Defendants argue the trial court erred in failing to sua sponte instruct the jury on the defense of mistake of fact with respect to the robbery and burglary counts. Lemmon argues: "The prosecution's case against [him] was a house of cards built on the prosecution's theory that appellant committed, aided and abetted, or conspired to commit robbery and burglary. To keep this house of cards from collapsing, the prosecution had to prove [he] intended to deprive Johnson of *his* property permanently." Defendants argue that since there was evidence their intent was merely to retrieve Welcher's belongings, and not steal Johnson's belongings, the trial court erred when it did not sua sponte give a mistake of fact defense.[4] Defendants further argue their trial counsel was ineffective in failing to request a mistake of fact instruction.

---

[4]   CALCRIM No. 3406, the mistake of fact instruction, provides:

15

The trial court has a sua sponte duty to instruct on " 'general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 996.) This duty does not extend to giving instructions on a defendant's attempt to negate or rebut the prosecution's proof of an element of the offense, i.e., pinpoint instructions. (*Ibid.*) Pinpoint instructions are required to be given only upon request. (*Ibid.*) However, as is relevant here, a trial court is under no duty, sua sponte or on request, to instruct on mistake of fact that does not amount to a defense under the evidence. (*People v. Osborne* (1978) 77 Cal.App.3d 472, 478.)

The defense of mistake of fact requires the defendant to believe circumstances which, if true, would make the act charged an innocent act. (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115.) The circumstances defendants claim to have believed to be true were that the backpacks taken from Johnson belonged to Lemmon's girlfriend. Because of this mistaken belief, they claim their intent to steal Johnson's property was negated.

---

"The defendant is not guilty of _____ *<insert crime[s]>* if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact.

"If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit _____ *<insert crime[s]>*.

"If you find that the defendant believed that _____ *<insert alleged mistaken facts>* [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for _____ *<insert crime[s]>*.

"If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for _____ *<insert crime[s]>*, you must find (him/her) not guilty of (that crime/those crimes)."

16

However, even if the backpacks had contained Welcher's belongings, this fact would not have made the robbery or burglary an innocent act. "It is no defense to a charge of robbery (or of theft) that the victim was not the true owner of the property taken. Theft can be committed against one who was himself a thief." (*People v. Moore* (1970) 4 Cal.App.3d 668, 669.) Neither a victim's illegal acquisition, nor illegal possession of property precludes a larceny conviction. (2 Witkin, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 22, p. 46; see also *People v. Nelson* (1880) 56 Cal. 77, 82 [" 'If A steal goods from B, and C afterward steals the same goods from A, C is a felon both as to A and B.' [Citation.]"].)

Thus, the trial court had no duty to give a mistake of fact instruction because even if Johnson's backpacks had contained Welcher's property, the act of barging into Johnson's motel room and forcibly taking the backpacks from Johnson's possession would not have been an innocent act. It necessarily follows that defendants' trial counsel were not ineffective for failing to request the instruction.

B. Matthews's Prior Misdemeanor

On direct examination the prosecutor asked Matthews to describe his prior felony convictions. His response was: "Uhmmm, possession of drugs. Uhmmm, let's see. I have a -- I believe it's a 288. [¶] . . . [¶] . . . And I believe I have a -- I'm not sure if it's a felony, but I believe I have an arson charge on my record, too." Also during direct examination Matthews admitted to being a drug addict, and to using methamphetamine at the time of the crime. On cross-examination Freed's attorney mentioned the section 288 and asked Matthews, "What is that?" The trial court sustained the prosecution's relevance objection.

Out of the jury's presence, the prosecutor told the trial court that Matthews's rap sheet indicated he had been *charged* with a violation of section 288, subdivision (a), a lewd or lascivious act on a child under the age of 14, but had been *convicted* of misdemeanor annoying or molesting a child. (§ 647.6.) Neither the prosecutor nor the

17

defense attorneys knew the underlying facts of the conviction. The court told defense counsel that if they could find the background information in a police report, then the information might come in. Otherwise, they were limited to discussing the fact that he suffered a misdemeanor that involved annoying or molesting a child under the age of 18.

Freed's counsel then argued the information was admissible to show Matthews's state of mind as to why he came up with the story he told bystanders at the motel that they were helping a 14-year-old girl, and why he was interested in the pornographic DVD's that were in one of the backpacks. The trial court stated that Matthews's knowledge or belief about his arrest was not relevant. The court stated it was tangential and that it did not see the connection.

Freed, joined by Lemmon argues the trial court abused its discretion when it refused to allow defense counsel to inquire into the facts underlying Matthews's misdemeanor conviction.

The fact of a misdemeanor conviction is inadmissible under traditional hearsay rules to impeach the truthfulness of a witness, although Evidence Code section 451.5 states a hearsay exception for certified official records of conviction. (*People v. Wheeler* (1992) 4 Cal.4th 284, 288; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1461.) However, the trial court has broad discretion to admit or exclude the acts of dishonesty or moral turpitude underlying a misdemeanor conviction pursuant to Evidence Code section 352. (*Wheeler*, at pp. 288, 295, 298-299.) Evidence Code section 352 grants the trial court discretion to exclude a prior conviction where the "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Where the witness subject to impeachment is not the defendant, factors bearing on whether the conviction is probative are whether the conviction reflects on honesty and is near in time. (*People v. Clair* (1992) 2 Cal.4th 629, 654; *People v. Woodard* (1979) 23

18

Cal.3d 329, 337, superseded by statute on another ground as recognized by *People v. Castro* (1985) 38 Cal.3d 301, 307-310.)  Neither of these factors was met here.  The trial court determined that Matthews's 2006 conviction was not near in time.  We agree that while the conviction was not in the distant past, it also was not particularly recent.  Plus, the conviction for annoying or molesting a child did not necessarily reflect on the witness's honesty.  " ' "Only a conviction which has as a necessary element an intent to deceive, defraud, lie, steal, etc., impacts on the credibility of a witness." [Citation.]  It is not sufficient that the prior offense shows a "disrespect for law" or a "character trait of willingness to do anything." [Citation.]' [Citation.]" (*Castro*, at p. 325.)  Annoying or molesting a child pursuant to section 647.6 requires only annoying or molesting a child under 18, and does not require any intent to deceive, defraud, lie, or steal.  Thus, the facts underlying the misdemeanor had little probative value in this case.

The trial court acted well within its considerable discretion in determining that delving into Matthews's prior misdemeanor conviction would unduly confuse the issues and mislead the jury, given its lack of probative value.

As for defendants' argument that the prior conviction was admissible to show Matthews's state of mind when he made up a story to tell bystanders involving a 14-year-old girl, Matthews's state of mind was simply not relevant.  As the trial court stated, "that's so tangential that I don't see the connection."

In addition to arguing that the trial court abused its discretion, defendants argue that in denying their right to cross-examine Matthews about his misdemeanor offense, the trial court violated their Sixth Amendment rights and due process rights.  We disagree.

"[N]ot every restriction on a defendant's desired method of cross-examination is a constitutional violation.  Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.  [Citations.]  . . . Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a

19

significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal.4th 894, 946, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Here, Matthews admitted two and possibly three felony convictions. As it happened, one of the supposed felonies was not a felony at all, but was the misdemeanor at issue. He also admitted he was a drug addict, had used methamphetamine most of his life, and was smoking at least a quarter gram of methamphetamine a day at the time of the murder. Defendants have not shown that the addition of the facts underlying Matthews's misdemeanor conviction for annoying or molesting a minor would have given the jury a significantly different impression of his credibility. Accordingly, there was no Sixth Amendment violation.

As to defendants' due process argument, we have determined that the trial court did not abuse its discretion, thus the cross-examination was properly excluded under Evidence Code section 352. "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (*People v. Hall* (1986) 41 Cal.3d 826, 834.) The trial court's exercise of discretion did not deny defendants' due process.

C. Evidence Regarding Porras

Ismael Porras, the man who was given the backpacks, testified under a grant of immunity after invoking his Fifth Amendment right. He testified that he was a friend of Freed's, but that he did not know Lemmon until he came to jail. He claimed he remembered very little of the events surrounding the crime, nor did he remember giving police an interview shortly after the murder. When the prosecutor asked him if his reluctance to testify was due to his not wanting to be labeled a snitch when he returned to

prison, he answered that he did not want to testify because he did not have any information.

Later, outside the presence of the jury, the prosecutor made an offer of proof that its investigating officer observed Porras make eye contact and smile and nod at Lemmon when he came into the courtroom, and smile, make eye contact and shake his head at Freed. The trial court allowed the investigating officer to testify to what he saw, but did not allow the officer to interpret what he saw.

Lemmon objected that the probative value of the evidence was outweighed by its prejudice. Freed objected that the evidence was cumulative because his client and Porras were friends.

The investigator testified that when Porras came into the courtroom, he saw "Mr. Porras make eye contact with Mr. Lemmon and then smile and nod his head." He testified that at the end of Porras's testimony he observed Porras make "eye contact with Mr. Freed and then shook his head in a left to right fashion."

Defendants now argue that the trial court abused its discretion in allowing the testimony because the probative value of the testimony was outweighed by its potential for prejudice. Defendants argue the probative value, which consisted of the testimony's tendency to suggest Porras was deliberately not remembering what happened, was so slight that its relevance was nonexistent. Defendants argue the potential for prejudice was great because it could have led the jury to believe Porras knew Freed had committed the crimes.

We disagree. It is the defendants' burden to establish an abuse of discretion. (*Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1307.) In the absence of a clear showing that the trial court's decision was arbitrary or irrational, we presume it acted to achieve legitimate objectives, and will not set aside its discretionary determinations. (*Ajaxo Inc. v. E*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 45.)

21

We agree with the trial court that the evidence had some probative value because of Porras's failure to remember anything of value when he testified. The investigator's evidence was relevant to show that Porras's lack of memory was feigned. We fail to follow the logic that it also implied Freed was guilty. Consequently, we find no abuse of discretion.

D. No Ineffective Assistance of Counsel

During the direct examination of Deckard, the prosecutor asked about Freed's statement following the murder that he might have hurt someone. The prosecutor asked if Deckard believed he had actually hurt someone. Deckard began, "Billy has been known to fight people, but he hadn't fought anybody in . . ." when Freed's attorney interrupted. The trial court ordered the jury to disregard the statement, and said outside the presence of the jury that he did not want to draw more attention to the statement. Freed's attorney agreed that was the best course. The attorney made no motion for mistrial.

Freed now claims that his trial counsel's failure to move for a mistrial denied his right to effective assistance of counsel.

" '[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected. [Citations.]" (*People v. Wilson* (1992) 3 Cal.4th 926, 936.) "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

A mistrial motion should be granted if the court is apprised of prejudicial error that cannot be cured by admonition or instruction. (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) Whether error is incurably prejudicial is a speculative matter, and the trial court has considerable discretion in ruling on mistrial motions. (*Ibid*.) "Accordingly, it would

22

be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance." (*Ibid*.)

For defendants to be successful in their claim of ineffective assistance, they would need to show that trial counsels' failure to move for mistrial was grounded in ignorance or misapplication of the law rather than tactical considerations, and that the motion bore a strong potential for success. (*People v. Haskett*, *supra*, 30 Cal.3d at pp 854-855.) Neither has been shown here.

It is highly improbable that the trial court would have granted the mistrial motion. The witness's statement was not highly prejudicial. In fact it indicated that Freed had reformed somewhat from his past fighting, and did not fight anymore. Also, the jury was instructed to disregard the statement, and there was no more mention of it. Nor have defendants offered any proof that trial counsel misunderstood or misapplied the law. It is more likely counsel realized the probability of a successful motion were minimal, and decided not to waste time and goodwill with the court on a losing argument.

For these reasons there was no ineffective assistance of counsel.

E. Voluntary Manslaughter Instruction

Defendants argue the trial court should have sua sponte given a voluntary manslaughter instruction based on a theory of imperfect self-defense and imperfect defense of others. We disagree.

Self-defense requires a reasonable, good faith belief in the need to defend oneself against imminent danger of death or great bodily injury. (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1261.) An actual but unreasonable belief in the need to defend is referred to as unreasonable or imperfect self-defense. (*Ibid*.) A related concept is recognized for an intentional killing in the actual but unreasonable belief one must protect another from imminent danger of death or great bodily injury. (*People v. Randle* (2005) 35 Cal.4th 987, 997, overruled on a different point in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

23

Imperfect self-defense and imperfect defense of others are not actually defenses, but are shorthand descriptions of a form of voluntary manslaughter, because they negate the element of malice. (*People v. Barton* (1995) 12 Cal.4th 186, 199-200.) Voluntary manslaughter is a lesser included offense of murder. (*Id.* at p. 199.) "[W]hen a defendant is charged with murder the trial court's duty to instruct sua sponte, or on its own initiative, on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense." (*Id.* at p. 201.)

"The concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined. We have explained that 'the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances.' [Citation.]" (*People v. Valencia* (2008) 43 Cal.4th 268, 288.)

Here, the only evidence regarding the initiation of the physical attack was through the testimony of Matthews. He testified that when Johnson opened the door to his motel room, Freed asked for a glass of water, asked if Johnson remembered him, then "cracked the guy in the face and entered the room." While it is true that Matthews gave a statement to police shortly after the murder wherein he stated Johnson let Freed in the room, he later told police that Freed immediately punched Johnson in the face and forced his way in. Matthews testified at trial that his response in the first interview was not true.

Matthews also testified that after the attack, Freed indicated the victim had fought *back*, and Lemmon complained, "[W]e were only supposed to rough the guy up." These statements both indicate that defendants were the aggressors. Thus, the only evidence

24

Matthews testified to at trial was that Freed initiated the physical attack. Even if, as Freed argues, a witness heard someone yelling "get off," "stop fighting" or "get off him," this would not change the fact that Freed was the initial aggressor, that Johnson had the right to defend himself.

Accordingly, the evidence was not such that a jury could reasonably conclude that defendants killed Johnson in the unreasonable but good faith belief in having to act in self-defense or defense of others, and no imperfect self-defense or defense of others instruction was appropriate. The trial court did not err in failing to give such instruction sua sponte.

F. Aider and Abettor Instruction

Freed argues the trial court erred when it refused to give an aider and abettor instruction he requested. There was no error.

The trial court instructed the jury with CALCRIM No. 400 as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."
Lemmon proposed adding the following language to the instruction: "An aider and abettor is responsible for her own state of mind, not the actual perpetrator's state of mind. [¶] An aider and abettor may be guilty of a greater-homicide offense than the actual perpetrator when the aider and abettor helped or induced the actual perpetrator to kill the victim, and in doing so, the aider and abettor's state of mind was more culpable than the actual perpetrator's state of mind based on the combined acts of both participants as well as the aider and abettor's individual state of mind. [¶] An aider and abettor may also be guilty of a lesser-homicide offense than the actual perpetrator when the aider and abettor[']s state of mind was less culpable than the actual perpetrator's state of mind based on the combined acts of both participants as well as the aider and abettor's

individual state of mind.  [¶]  The People have the burden of proving beyond a reasonable doubt the defendant's own state of mind."

Freed, joined by Lemmon, now argues the proffered instruction was necessary to convey to the jury that an aider and abettor may be more or less culpable than the actual perpetrator depending on the aider and abettor's state of mind.  They argue the instruction was a pinpoint instruction that the trial court was required to give upon request.

"A pinpoint instruction relates specific evidence to the elements of the offense, highlighting a defense theory, and must be given on request . . . ." (*People v. Grassini* (2003) 113 Cal.App.4th 765, 777.)  While the trial court is required to instruct sua sponte on the general principles of law necessary to the jury's understanding of the case, a pinpoint instruction need not be given sua sponte.  (*Ibid.*)  The instruction the defendants proffered below was not a pinpoint instruction because it did not relate specific evidence to the elements of the offense.  Instead, the instruction was offered to explain the general principles of law necessary to the jury's understanding of the law of aiding and abetting.  However, the instructions that were given correctly instructed the jury on the law of aiding and abetting.

Defendants cite *People v. Loza* (2012) 207 Cal.App.4th 332, and argue the instruction did not adequately convey to the jury that an aider and abettor may be found guilty of a greater or lesser homicide crime than the perpetrator.  *Loza* involved a prior version of CALCRIM No. 400, a version that was not given in this case.  The old version instructed the jury that a person was " 'equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator . . . .' " (*Loza,* at p. 348.) *Loza* concluded the instruction was generally accurate, but potentially incomplete under the circumstances of that case.  (*Id*. at p. 350.)  Here, the objectionable word "equally" was deleted from the instruction, thus the instruction was not just generally accurate, but was completely accurate.

26

Moreover, the trial court instructed the jury with CALCRIM No. 401, which stated: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that, first, the perpetrator committed the crime; second, the defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider or abettor. If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider or abettor; however, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider or abettor."

The instructions given did not imply that an aider and abettor must be guilty of the same crime as the perpetrator, and there is no evidence the jury was confused by the instructions. Instead, the instructions correctly stated that the aider and abettor must know and intend to aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime. The trial court thus correctly instructed the jury regarding the requisite mental state for an aider and abettor, and did not err in refusing defendants' requested instruction.

G.  Provocation Instruction

Freed, joined by Lemmon, argues he received ineffective assistance of counsel at trial because his trial counsel failed to request CALCRIM No. 522, which provides: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for

27

you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.] [¶] [Provocation does not apply to a prosecution under a theory of felony murder.]" Freed recognizes that the instruction is a pinpoint instruction, thus not an instruction which the trial court must give sua sponte. (*People v. Rogers* (2006) 39 Cal.4th 826, 877-878.)

Freed argues the jury could have believed that Johnson let him into his motel room, that an argument and fight ensued thereafter because Johnson would not surrender Welcher's property, and that Freed was provoked into stabbing Johnson, thereby negating the element of premeditation and deliberation, and reducing first degree murder to second degree murder.

To prevail on a claim of ineffective assistance of counsel, defendants must establish that: (1) trial counsel's representation fell below an objective standard of reasonableness, and (2) prejudice, i.e., that there is a reasonable probability that but for counsel's deficient performance, the result of the trial would have been different. (*People v. Williams* (1997) 16 Cal.4th 153, 214-215.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1988) 44 Cal.3d 883, 937.) In demonstrating prejudice, defendants "must carry [their] burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*Ibid.*)

We need not determine whether counsel's performance was deficient if we can dispose of the claim on the ground of lack of prejudice. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.) There is not a reasonable probability of a different outcome here because the jury, in addition to finding defendants guilty of first degree murder after receiving felony-murder, premeditation, and lying-in-wait instructions, found true the special allegations that defendants murdered Johnson during the commission of robbery

28

and burglary. Section 189 provides that all murder committed in the perpetration or attempted perpetration of robbery and burglary is first degree murder. Thus, even if there were sufficient evidence of provocation, it would not reduce the murder to second degree because provocation cannot negate first degree murder in the commission of a robbery or burglary. (See *People v. Wright* (2015) 242 Cal.App.4th 1461, 1496 [No prejudice in court's refusal to give provocation instruction where jury found true special circumstance of lying in wait.].) Accordingly, any claim of ineffective assistance of counsel fails because defendants cannot show prejudice.

## DISPOSITION

The judgment against Lemmon is modified by staying the sentence on count two and its enhancements pursuant to Penal Code section 654. As modified, Lemmon's judgment is affirmed. The trial court shall amend Lemmon's abstract of judgment to correct the clerical error in item four of the abstract indicating Lemmon was sentenced pursuant to two strikes.

The judgment against Freed is affirmed. The trial court shall amend Freed's abstract of judgment to correct the clerical error in item four of the abstract indicating Freed was sentenced pursuant to two strikes. The trial court shall then forward a certified copy of the amended abstracts to the Department of Corrections and Rehabilitation.


        Blease, Acting P. J.

We concur:


Nicholson, J.


Butz, J.

29